GOLDEN DOOR JEWELRY CRE-
ATIONS, INC. and Suisse Gold Assayer
& Refinery, Inc., Plaintiffs,

v.

LLOYDS UNDERWRITERS NON-MA-
RINE ASSOCIATION and Peter Freder-
ick Wright, Defendants.

LEACH & GARNER CO., Plaintiff,

v.

Peter Frederick WRIGHT, Defendant.

Nos. 83-1409-CIV, No. 84-0354-CIV.

United States District Court,
S.D. Florida.

Oct. 17, 1994.

David Russell, Miller & Russell, Coral Gables, FL, for plaintiff Golden Door Jewelry Creations, Inc.

Henry Burnett, Steven E. Stark, Fowler, White, Burnett, Hurley, Banick & Strickroot, P.A., Sam Daniels, Barranco & Associates, Miami, FL, Herbert P. Polk, Manhasset, NY, for defendants Lloyds Underwriter Non–Marine Ass'n and Peter Frederick Wright.

Joseph L. Rebak, Tew, Garcia–Pedrosa & Borgognoni, Miami, FL, for intervenor-plaintiff Westway Metal Corp.

Ronald B. Hamilton, Cozen & O'Connor, Philadelphia, PA, for intervenor-plaintiff Leach & Garner Co.

John H. Phelan, Kimbrell & Hamann, Miami, FL, William Reese, Wicker, Smith, Blomqvist, Tutan, O'Hara, McCoy, Graham & Lane, Miami, FL, for intervenor-defendant Lawrence Systems, Inc.

***MEMORANDUM ORDER ON REMAND FROM THE ELEVENTH CIRCUIT; ADOPTING AND RATIFYING IN PART AND OVERRULING IN PART THE SPECIAL MASTER'S MEMORANDUM OPINION AND RECOMMENDATION DATED AUGUST 16, 1990 REGARDING PAYMENTS MADE BY LLOYDS UNDERWRITERS NON–MARINE ASS'N TO WITNESSES AND OTHER INDIVIDUALS; GRANTING IN PART AND OVERRULING IN PART INTERVENOR–PLAINTIFFS WESTWAY METALS CORPORATION'S AND LEACH & GARNER CO.'S RESPECTIVE OBJECTIONS AND EXCEPTIONS TO THE SPECIAL MASTER'S MEMORANDUM OPINION AND RECOMMENDATIONS***

ARONOVITZ, District Judge.

THIS CAUSE comes before the Court on remand from an opinion entered by the United States Court of Appeals for the Eleventh Circuit on December 6, 1993. The Eleventh Circuit remanded this action for "further proceedings as necessary" with regard to what effect, if any, payments in the total amount of $753,081.42 made by defendant Lloyds Underwriters Non–Marine Association ("Lloyds") to certain fact witnesses and other individuals should have on this case. *See Golden Door Jewelry Creations, Inc. v. Lloyds Underwriters Non–Marine Ass'n,* 8 F.3d 760, 768–69 (11th Cir.1993) (hereinafter referred to as *"Golden Door II"*).

The Court has considered the opinion of the Eleventh Circuit, the Special Master's Memorandum Opinion and Recommendations dated August 16, 1990 and file dated January 8, 1991, including the exhibits attached thereto; Intervenor–Plaintiff Westway Metals Corp.'s Objections to the Special Master's Memorandum Opinion and Recommendation, file dated January 22, 1991; Leach & Garner Company's Exceptions to Special Master Latimer's Memorandum Opinion and Recommendations of August 16, 1990, file dated January 22, 1991; Lloyd's Memorandum in Support of Master's Recommendation that Lloyds Not Be Sanctioned for Making Witness Payments, file dated September 20, 1994; Leach & Garner Company's Memorandum of Law in Opposition to Special Master Latimer's Memorandum Opinion and Recommendation of August 16, 1990, file dated October 5, 1994; oral argument of counsel; the applicable law and the pertinent portions of the record, and is otherwise fully advised in the premises. Based upon the aforegoing, and for the reasons stated herein, this Court holds that:

1. The Special Master's Memorandum Opinion and Recommendation, dated August 16, 1990 (the "Special Master's Report"), is hereby ADOPTED AND RATIFIED IN PART AND OVERRULED IN PART. Specifically, the Court ADOPTS AND RATIFIES the findings of fact contained in the Special Master's Report but REJECTS AND OVERRULES the conclusions of law and recommendations made therein.

2. The evidence of Lloyds' payment in the total sum of $753,081.42 to witnesses, informants and intermediaries does not support a violation of 18 U.S.C. § 201(b)(3) or § 201(c)(2).

3. Of the $753,081.42 paid, Lloyds (with its counsel's knowledge and assistance) paid a total sum of $120,000.00 to fact witnesses Ed Hollock and Abraham Lupovitz to testify at depositions in this civil action. Said conduct constitutes a clear violation of Rule 4–3.4(b) of the Rules of Professional Conduct,

as adopted in Florida, and of *The Florida Bar v. Jackson*, 490 So.2d 935 (Fla.1986).

4. As the result of Lloyds' and its counsel's ethical violations, sanctions against Lloyds is warranted. The Court finds that the exclusion of all evidence tainted by the ethical violations is proper and appropriate. Accordingly, Lloyds shall not be permitted to submit into the evidence in this civil action the testimony given in this case by any fact witnesses who received monetary compensation from Lloyds.

### *Factual and Procedural Background*

This civil action was originally brought by two Florida corporations, Golden Door Jewelry Creations, Inc. ("Golden Door") and Suisse Gold Assayer & Refinery, Inc. ("Suisse Gold") against their insurer Lloyds and underwriter Peter Frederick Wright (collectively referred to as "Lloyds" or the "Defendants") to recover insurance monies under jewelers' block policies in connection with the theft of over $9 million of gold from a warehouse in Miami, Florida on February 10, 1983. A portion of the gold stolen was on consignment to Golden Door and Suisse Gold by Westway Metals Corporation ("Westway") and Leach & Garner Company ("Leach"), respectively. Westway and Leach intervened as plaintiffs in the original case, seeking to recover from the Defendants under the insurance policies at issue.[1] The facts of this case are fully set forth in *Golden Door Jewelry Creations, Inc. v. Lloyds Underwriters*, 748 F.Supp. 1529 (S.D.Fla.1990) (hereinafter referred to as "*Golden Door I*") and *Golden Door II, supra*, and need not be repeated herein.

### A. PROCEDURAL HISTORY

The procedural history of the instant subject matter dates back to February 1, 1990 when Westway filed a motion for an order to show cause against Lloyds, seeking to have Lloyds' pleadings stricken as a sanction for Lloyds' payment of monies to certain fact witnesses in the action. Pursuant to Fed. R.Civ.P. 53(c), the Court referred the matter to the Special Master, Henry Latimer, Es-

---

1. Leach brought a separate action against Peter Frederick Wright, asserting the same grounds for relief. Leach's lawsuit, originally designated as

Case No. 94–0354–CIV–HOEVELER, was consolidated with the original suit brought by Golden Door and Suisse Gold.

quire, to hold an evidentiary hearing on whether Lloyds' pleadings should be stricken and/or other sanctions imposed on Lloyds. Following six days of an evidentiary hearing, the Special Master issued a report recommending that the motion for sanctions be denied. He concluded that the only sanctions warranted was that Lloyds should be required to fully disclose to the jury the circumstances surrounding the payments and that opposing counsel should be given full opportunity to cross-examine the witnesses regarding the payments.

The Special Master opined that "this is an extraordinary case where extraordinary measures were required (in fact, dictated) by circumstances beyond Lloyd's control if it were to defend this action ..." *See* Special Master's Report at 3. The basis of the Special Master's recommendation appears to be his finding that the witnesses would not have come forward and offered the information and testimony unless they were paid, that Lloyds could not have otherwise obtained the cooperation and testimony of the witnesses, that the information and testimony given by the fact witnesses was material and truthful, and that Westway submitted no authority prohibiting the payment to witnesses to give *truthful* testimony.[2]

On January 22, 1991, Leach and Westway filed their respective exceptions and objections to the Special Master's Report, contending, among other things, that the Special Master failed to consider 18 U.S.C. § 201. The intervenor-plaintiffs argued that 18

U.S.C. § 201 makes it a crime to pay witnesses to testify, regardless of whether the testimony given was truthful or false. Meanwhile, after two days of oral argument, this Court entered a memorandum order granting, *inter alia,* summary judgment in favor of Leach and Westway on October 11, 1990. *See Golden Door I,* 748 F.Supp. 1529 (S.D.Fla.1990). Subsequently, this Court ratified, affirmed and approved the Special Master's Report and overruled the intervenor-plaintiffs' objections thereto, noting that "[t]he underlying issues are rendered moot by the terms of the ruling contained herein and in [*Golden Door I* ]." *See* Omnibus Order Addressing Post–Order (10/11/90) Motions, file dated February 21, 1990.

On December 6, 1993, the Eleventh Circuit vacated the summary judgments that were entered in favor of Westway and Leach. *See Golden Door II, supra.* In so doing, the Eleventh Circuit stated that the issues raised in the intervenor-plaintiffs' objections to the Special Master's Report are "once again relevant" and remanded those questions "to the district court for further proceedings as necessary." *Golden Door II,* 8 F.3d at 769. Thereafter on August 30, 1994, the Defendants moved for a ruling on the intervenor-plaintiffs' objections to the Special Master's Report.

**B. RELEVANT FACTUAL HISTORY—SPECIFIC PAYMENTS MADE BY LLOYDS**

The Special Master found that following the theft of the gold from the warehouse,

**2.** Specifically, the Special Master made the following legal conclusions: (1) there was insubstantial evidence that Lloyds engaged in illegal witness tampering under Florida law and in fact, no party has claimed that the testimony given by Ed Hollock and Abraham Lupovitz was untruthful; (2) the federal witness tampering statute, 18 U.S.C. § 1512, prohibits witness tampering but also provides that it is a defense that the witness was induced to tell the truth rather than give untruthful testimony; (3) no authority had been cited for the proposition that payments to witnesses in order to get them to tell the truth are improper, illegal or unethical; (4) in the civil context, under certain limited circumstances, no prohibitions exist against paying for testimony believed to be truthful when such payments and arrangements are timely disclosed to adverse parties and there is an opportunity to examine the witnesses regarding such payments. *United*

*States v. Cresta,* 825 F.2d 538 (1st Cir.1986); (5) Rules 4–3.3 and 4–3.4 of the Code of Professional Responsibility prohibit a lawyer from offering false testimony and obstructing justice. In this case, there was no evidence that the witnesses were paid to give false testimony; (6) the offer of compensation to witnesses, by money or promises, where such witnesses are to come forward to testify truthfully, is not prohibited by any authorities found by the Special Master; (7) no authority had been cited that requires prior permission from a court in order to post a reward or make payments to witnesses for their truthful testimony; and (9) no authority had been cited calling for any greater sanction than allowing the paid witness to be impeached on cross-examination with respect to the amount and nature of compensation. *See* Special Master's Report at 27–30.

Lloyds posted a $250,000.00 reward for information surrounding the robbery. In March or April of 1983, Ed Hollock or his intermediary contacted Lloyds and demanded payment in exchange for information. This demand and subsequent payments began Lloyds' journey of making similar payments to witnesses, potential witnesses, intermediaries, bodyguards and others. *See* Special Master's Report at 3–4.

The evidence adduced at the evidentiary hearing before the Special Master established that as of June 14, 1990, Lloyds paid a total sum of $753,081.42, broken down as follows:

| | |
|---|---|
| Fact witness Ed Hollock | $493,103.00 [3] |
| Fact witness Abraham Lupovitz | 147,000.00 [4] |
| Informant J. Pugach | 45,000.00 [5] |
| Attorney Jan Wenzler | 15,000.00 [6] |
| Attorney Myles Ambrose | 5,857.49 [7] |
| Attorneys Bruno J. Pateras and Jean–Claude Hebert | 27,500.00 [8] |
| Related Expenses for the testimony of Ed Hollock and Abraham Lupovitz. | 19,620.93 |
| TOTAL | $753,081.42 |

---

3. This sum consisted of the following payments made to Ed Hollock:

| | |
|---|---|
| August 3, 1983 | $100,000.00 |
| August 30–September 2, 1983 | 25,000.00 |
| October 7, 1983 | 25,000.00 |
| November 15, 1983 | 23,000.00 |
| February 14, 1984 | 5,885.00 |
| May 3, 1984 | 85,000.00 |
| October 1984–July 1987 | 65,505.00 |
| January 28, 1985 | 2,600.00 |
| March 1987 | 10,000.00 |
| December 1987 | 13,200.00 |
| June 1988 | 12,913.00 |
| April 1989 | 25,000.00 |
| August 1987 | 100,000.00 |
| TOTAL | $493,103.00 |

*See* Special Master's Report at 7–8.

4. This sum consisted of the following payments made to Abraham Lupovitz:

| | |
|---|---|
| December 13, 1988 | $ 25,000.00 |
| January 5, 1989 | 25,000.00 |
| April 11, 1989 | 22,000.00 |
| May 1, 1989 | 10,000.00 |
| June 8, 1989 | 65,000.00 |
| TOTAL | $147,000.00 |

*See* Special Master's Report at 12.

5. This sum consisted of five payments made to J. Pugach between May 25, 1984 through March 1, 1985. *See* Special Master's Report at 15.

6. Jan Wenzler ("Wenzler") was a Canadian attorney who acted as an intermediary for Ed Hollock. Lloyds paid Wenzler $15,000.00 on September 12, 1984 for his intermediary services, which included arranging for Ed Hollock to be contacted, paid, carry out assignments, give depositions and granted immunity. *See* Special Master's Report at 16.

7. Myles Ambrose ("Ambrose") was a Washington, D.C. attorney who also acted as an intermediary for Ed Hollock. Lloyds paid Ambrose $5,857.49 on November 8, 1983 for his intermediary services. *See* Special Master's Report at 16.

8. Bruno J. Pateras ("Pateras") and Jean–Claude Hebert ("Hebert") were both Canadian attorneys who acted as intermediaries for Abraham Lupovitz. Between December 3, 1988 and July 12, 1989, Lloyds paid Pateras and Hebert a total of $27,500.00 for their intermediary services. *See* Special Master's Report at 17.

Lloyds does not dispute the fact that it made these payments to the above named individuals.

As is readily apparent from the Special Master's findings, the bulk of Lloyds' payments were made to Ed Hollock ("Hollock") and Abraham Lupovitz ("Lupovitz"), both of whom are fact witnesses and who gave deposition testimony in this action as a result of the payments. The intervenor-plaintiffs do not object to Lloyds' payments to witnesses, informants and intermediaries in exchange for their cooperation and information in helping to solve the robbery. They challenge only the payment of money to fact witnesses *for the purpose of obtaining testimony.* Thus, the Court need not—and does not—address the propriety of the payments made to informant J. Pugach, the intermediaries and others for non-testimonial services.

Hollock was a Canadian citizen at all relevant times. He disclosed, among other things, that a few weeks prior to the theft, he travelled with Pierre Sarasin to Dade County, Florida for the purpose of staging a robbery at Golden Door and Suisse Gold at the request of Sandy Credin ("Credin"). Credin was the chief operating officer of Golden Door and Suisse. Hollock and Sarasin's efforts were foiled and they aborted their plan and returned to Canada. *See* Special Master's Report at 5–6.

Abraham Lupovitz was the brother-in-law and business associate of Sandy Credin, who, in exchange for money from Lloyds and a grant of immunity from the United States Attorney, informed the authorities of Credin's whereabouts, which resulted in the extradition of Credin from Germany after the theft. *See* Special Master's Report at 10–11.

The Special Master found that of the total $493,103.00 paid by Lloyds to Hollock, $260,505.00 was attributable to his participation in the civil action. Lloyds paid Hollock $85,000.00 for a deposition noticed by Lloyds and taken in May of 1984, $10,000.00 for a deposition noticed by Leach and taken in March of 1987, $65,000.00 in living expenses paid on a monthly basis from October of 1984 to July of 1987, and $100,000.00 on August 3, 1983 as

a reward for original information. *See* Special Master's Report at 9.

Of the $147,000.00 Lloyds paid to Lupovitz, the Special Master found that $25,000.00 was for original information, $22,000 for living expenses, $25,000.00 for a deposition in the civil action, and $72,000.00 for agreeing to appear to testify against Sandy Credin at Credin's criminal trial. *See* Special Master's Report at 12.

While the Special Master clearly found that Lloyds made the payments to induce the aforementioned individuals' cooperation and/or testimony, the Special Master made no findings of fact as to whether and to what extent Lloyds' counsel participated in that conduct. Lloyds was represented by Herbert P. Polk, Esquire of Whitman & Ransom in New York, New York. The documentary evidence adduced at the evidentiary hearing and attached to the Special Master's report as exhibits squarely supports the finding that Lloyds' counsel knew about, acquiesced and even negotiated the amount of the money Lloyds paid to the witnesses, informants and intermediaries and actively participated and assisted in the transfer of the funds.

For example, in a memorandum to the file dated April 20, 1989, Lloyds' adjuster, Harold J. Smith writes, "[o]n April 12, 1989, while I was in Montreal, I called Eddie [Hollock]. He had originally asked for $35,000.00 in Montreal and $15,000.00. On April 11th, Herb Polk said he didn't feel comfortable with that. He felt we should offer him $15,000.00 in Florida and $35,000.00 after he finished." *See* Exhibit 54. In a memorandum dated April 10, 1989 from Ruth Gast of Whitman & Ransom to Herb Polk and Harold Smith, Ms. Gast states that "Ed Hollock called. Said that he was supposed to receive $35,000.00. I told him I had no instructions on this as yet." *See* Exhibit 54. In a memorandum to the file dated October 11, 1984, Harold Smith states that "[o]n October 9, 1984, Herb Polk told me that Peter Wright was shown the letter from Jan [Wenzler] and that he suggested that if we felt there was any value, that we should dole the money out to him." *See* Exhibit 39. In an undated memorandum to the file, Harold Smith

writes "[o]n January 20, 1986, when we were in Montreal, Herb Polk and I had discussed the figures that we would be willing to pay Gabby. I originally said we should start with $50,000 and go to $100,000. Herb thought it could bring in as much as $250,000, since the case would be over if that testimony was in." *See* Exhibit 26.

Additional evidence of Lloyds' counsel involvement with Lloyds' compensation endeavors include, but is not limited to, the following: the notes of an October 25, 1984 meeting reflects that Harold Smith reported that "[c]oncerning Eddie Hollock, he has been deposed which is all we need of him. But just as an insurance policy we should keep him happy with small amounts of money if requested. Eddie has requested $25,-000. It was agreed by the Steering Group that amounts of $1,000 should be paid to him as and when deemed necessary by Messrs Polk and Smith." *See* Exhibit 24; a letter dated July 12, 1989 from Herbert Polk to Bruno J. Pateras, enclosing two checks directly from Whitman & Ransom, one made payable to Bruno J. Pateras and Jean–Claude Hebert in the amount of $10,000.00 and the other made payable to Bruno J. Pateras, Q.C. in the amount of $7,500.00. *See* Exhibit 23; a letter from Harold Smith to Herbert Polk, requesting Mr. Polk to "put[ ] in ship-shape form" the attached marked-up agreement between Lloyds and J. Pugach concerning Lloyds' payment to J. Pugach. *See* Exhibit 49; a memorandum to the file dated April 24, 1984 prepared by Harold Smith that states "[o]n April 16, 1984, I met with Herb Polk at his office. We discussed the 7 demands of Eddie ..." *See* Exhibit 41; a memorandum to the file dated August 29, 1983 prepared by Harold Smith, stating that with regard to his agreement to meet with Eddie at LaGuardia Airport, Herb Polk "suggested that I take a check for $25,000.00 with me. He is arranging to have a messenger meet me with the check at the plane." *See* Exhibit 16.

The record further shows that the United States of America never requested either Hollock or Lupovitz to appear at any deposition in this civil litigation. Likewise, the State of Florida never requested that Lloyds pay money to Hollock or anyone else for any services in connection with the civil action.

## Discussion

The issue *sub judice* is whether sanctions should be imposed against Lloyds for its payment of money to fact witnesses Ed Hollock and Abraham Lupovitz to testify in this civil action. As previously stated, Lloyds does not dispute the fact that it paid Hollock a total of $493,103.00, $95,000 of which was paid to Hollock to testify at two depositions in this civil action. Lloyds also does not dispute that it paid Abraham Lupovitz a total of $147,000, $25,000 of which was paid to Lupovitz to testify at a deposition in this civil action.

Lloyds offers several reasons to justify its payments: (1) that it sought only the truth and truthful testimony; (2) that the payments were made with the knowledge and cooperation of federal and local enforcement agencies; (3) that the bribery statute of 18 U.S.C. § 201 is inapplicable to the facts of this case because the testimony obtained was truthful; and (4) that the persons responsible for the theft were apprehended and convicted as the result of the testimony and cooperation obtained through Lloyds' monetary rewards.

Westway and Leach, on the other hand, contend that the payments were improper and constituted a criminal offense. Specifically, they challenge three conclusions of law made by the Special Master, namely conclusion of law numbers 3, 5 and 6, *see* footnote 2, *supra*, on the grounds that the Special Master (1) failed to consider 18 U.S.C. § 201(b)(3) or § 201(c)(2), which makes the act of paying witnesses to testify a criminal offense; (2) erroneously concluded that there was no violation of Rule 4–3.4 of the Rules of Professional Conduct, as adopted in Florida; and (3) failed to consider the case of *The Florida Bar v. Jackson*, 490 So.2d 935 (Fla. 1986).

### A. STANDARD OF REVIEW

This Court in *Corporacion Salvadorena de Calzado, S.A. v. Injection Footwear Corporation*, 533 F.Supp. 290 (S.D.Fla.1982), has previously set forth the following standard to be

applied in reviewing the recommendations of a Special Master:

> The Special Master's Conclusions of Law carry no weight with the Court. Since plaintiff has challenged the Special Master's Conclusions of Law, this Court is obligated to undertake a sufficient review of the record herein to determine whether the findings are correct.

*Id.* at 300 (citations omitted).

The Court has undertaken a thorough and independent review of the Special Master's Report and the pertinent portions of the record and, as set forth and for the reasons stated below, concludes that the Special Master's conclusions of law with regard to the proprietary of Lloyds' payments to Hollock and Lupovitz to induce their testimony were incorrect.

### B. VIOLATION OF 18 U.S.C. § 201

The intervenor-plaintiffs contend that the Special Master's Report was erroneous in that it did not consider 18 U.S.C. § 201. They maintain that Lloyds' payments to the fact witnesses constituted a crime pursuant to 18 U.S.C. § 201(b)(3) and § 201(c)(2). The Court disagrees.

■ 18 U.S.C. § 201 is entitled "Bribery of public official and witnesses" and makes the bribery of public officials and witnesses a criminal offense. Section 201(b)(3) provides punishment to whoever:

> Directly or indirectly, *corruptly* gives, offers or promises anything of value to any person, or offers or promises such person to give anything of value to any other person or entity, with intent to influence the testimony under oath or affirmation of such first-mentioned person as a witness upon a trial, hearing, or other proceeding, before any court ...

18 U.S.C. § 201(b)(3) (emphasis added). Bribery under this section requires a corrupt mind by the alleged bribe-giver. *See Okabe v. Immigration and Naturalization Service,* 671 F.2d 863, 865 (5th Cir.1982) ("Offering a bribe under this statute [§ 201(b)(3)] is a crime involving moral turpitude, for a corrupt mind is an essential element of the offense"); *United States v. Hsieh Hui Mei*

*Chen,* 754 F.2d 817, 822 (9th Cir.), *cert. denied,* 471 U.S. 1139, 105 S.Ct. 2684, 86 L.Ed.2d 701 (1985) (bribery under § 201(b) "requires 'corrupt intent'"). Having reviewed the record, the Court concludes that there is insufficient evidence to show that Lloyds harbored the requisite corrupt mind in making the payments to the witnesses. Therefore, the evidence does not support a violation of § 201(b)(3).

■ Section 201(c)(2), on the other hand, does not require a corrupt mind. It makes it a crime for anyone who:

> Directly or indirectly, gives, offers or promises anything of value to any person, for or because of the testimony under oath or affirmation given or to be given by such person as a witness upon a trial, hearing or other proceeding, before any court, ...

18 U.S.C. § 201(c)(2). The intervenor-plaintiffs assert that under this statute, the mere act of paying a fact witness to testify is a criminal offense. Lloyds responds that § 201(c)(2) does not apply where the testimony obtained was truthful testimony.

The plain language of § 201(c)(2) does not distinguish between truthful or untruthful testimony. Moreover, the legislative history of § 201(c)(2) is silent on whether Congress intended to make such a distinction. *See* S.Rep. No. 2213, 87th Cong., 2nd Sess. (1962), reprinted in 1962 U.S.Code Cong. & Admin.News 3852. The governing Court of Appeals for the Eleventh Circuit, however, has addressed this issue in dicta in *United States v. Moody,* 977 F.2d 1425 (11th Cir. 1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1948, 123 L.Ed.2d 653 (1993).

■ In *United States v. Moody,* the issue before the Eleventh Circuit was whether § 201(c)(2) was unconstitutionally overbroad and vague. The challenger had been convicted under § 201(c)(2) and claimed that the statute was overbroad and vague because it "does not expressly require a showing of evil intent on the bribe-giver's part or *even that the testimony of the witness be false.*" *Moody,* 977 F.2d at 1424 (emphasis added). The Eleventh Circuit ruled that § 201(c)(2) was not unconstitutionally overbroad or

vague. In rejecting the vagueness challenge, the Eleventh Circuit reasoned as follows:

> A criminal statute is not unconstitutionally vague if it "define[s] the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." ....
>
> *Giving something of value "for or because of" a person's testimony obviously proscribes a bribe for false testimony;* persons of ordinary intelligence would come to no other conclusion.

*Id.* at 1424–25 (citations omitted) (emphasis added). Thus, the Eleventh Circuit in *dicta* has indicated that the criminal act contemplated in and encompassed by § 201(c)(2) is the giving something of value "for false testimony." It appears to this Court that in construing § 201(c)(2), the Eleventh Circuit has made a distinction between truthful and untruthful testimony. Because there is no evidence in the record that the testimony elicited through Lloyds' monetary inducements was false testimony, the Court concludes that the evidence does not support a violation of § 201(c)(2).[9]

Accordingly, the Court concludes that the evidence in this case does not support a finding that Lloyds violated 18 U.S.C. § 201(b)(3) or § 201(c)(2).[10]

## C. RELEVANT ETHICAL STANDARDS IN FLORIDA

▉ The intervenor-plaintiffs assert that Lloyds' compensation to Hollock and Lupovitz for their testimony violated Rule 4–3.4(b) of the Rules of Professional Conduct, as adopted in Florida, as well as the case of *The Florida Bar v. Jackson,* 490 So.2d 935 (Fla. 1986). The Court agrees.

1. *Rule 4–3.4(b) of the Rules of Professional Conduct*

Rule 4–3.4(b) of the Rules of Professional Conduct, as it existed in Florida during the relevant time period, provided that:

> A lawyer shall not:
>
> *      *      *      *      *      *
>
> (b) fabricate evidence, counsel or assist a witness to testify falsely, or offer an inducement to a witness that is prohibited by law.

*See* Rule 4–3.4(b) of the Rules of Professional Conduct. The Special Master focused on the "testify falsely" and "prohibited by law" language and concluded that because there was no evidence of false testimony and because it found no authority prohibiting the payment of money to obtain truthful testimony, there was no violation of Rule 4–3.4(b). *See* Special Master's Report at 29. The Court does not adopt this view.

Rather, as discussed below, Lloyds' repetitive payments to Hollock and Lupovitz were clearly prohibited by *The Florida Bar v. Jackson,* 490 So.2d 935 (Fla.1986). Moreover, the comment to Rule 4–3.4(b) indicates that the rule applies to any payments to fact witness, without distinguishing between false and truthful testimony. The comment provides, in pertinent part, that:

> The common law rule in most jurisdictions is that *it is improper to pay an occurrence witness any fee for testifying* and that it is improper to pay an expert witness a contingent fee.

Comment to Rule 4–3.4 (emphasis added).

It is undisputed that Lloyds (with the active assistance of its counsel) paid substantial sums to fact witnesses Hollock and Lupovitz to induce them to testify at depositions taken in this case. The evidence further indicates that Lloyds paid for the testimony contingent upon the following three conditions: (1) the testimony had to be truthful; (2) the testimo-

---

9. The Court's conclusion in this regard is buttressed by the fact that the intervenor-plaintiffs have failed to cite a single case in which a court has held that paying a fact witness to give truthful testimony is a *criminal offense* under § 201(c)(2). Moreover, independent research has not revealed such a case.

10. Even though the Court finds that there was no *per se* violation of 18 U.S.C. § 201(b)(3) and § 201(c)(2), it can readily be argued from what did transpire based on the Special Master's Report that substantial transgressions by Lloyds and its counsel did occur in this case.

ny had to be material; and (3) the testimony had to be helpful to Lloyds in defense of this civil litigation. The Court finds that this conduct was egregious and constituted willful and repetitive violations of Rule 4–3.4(b) of the Rules of Professional Conduct.

Lloyds' counsel argued during oral argument on September 28, 1994 that Lloyds is not subject to the Rules of Professional Conduct because it is not an attorney. That it was Lloyds that provided the actual funds for the payments rather than its counsel does not defeat the application of Rule 4–3.4(b). The evidence in the record shows quite clearly that Lloyds' counsel Whitman & Ransom actively had knowledge of, assisted and even negotiated the amounts of the money paid to non-expert witnesses, informants and intermediaries. *See, e.g.,* Exhibits 16, 23, 24, 26, 39, 41, 49 and 54 attached to the Special Master's Report. Based upon the evidence presented to the Special Master, the Court finds that Whitman & Ransom unquestionably played an active and extensive role in procuring the testimony of witness through monetary inducements, in violation of Rule 4–3.4(b).

The Special Master referred to an ethical opinion 64–42 in support of his recommendation. *See* Special Master's Report at 28. In that ethical opinion, issued by the Professional Ethics of the Florida Bar on July 16, 1964, the Florida Bar stated that it was not unethical for an attorney to negotiate with and pay for the testimony of the paramour of the client's wife in a hotly contested divorce case, provided the attorney also made a full disclosure of the circumstances to the court and to opposing counsel before or at the time the testimony is offered.

The Court does not find this ethical opinion persuasive or controlling in light of the clear decision to the contrary by the Florida Supreme Court in *The Florida Bar v. Jacksson, supra.* Moreover, the ethical opinion itself "stress[ed] that each case of this nature must be viewed separately with great care." It further stated that "[t]here are some legal questions implicit in the inquiry. The Committee expresses no opinions on matters of law." The ethical opinion clearly did not

contemplate the matters of law involved in this particular action.

2. *Case Law on the Propriety of Paying Fact Witness to Testify*

The Court's decision that Lloyds and its counsel have committed violations of the ethical rules of Florida is supported by *The Florida Bar v. Jackson,* 490 So.2d 935 (Fla. 1986). In that case, the Florida Supreme Court ruled that it was improper for an attorney to request that his clients be paid $50,000 for their testimony in a pending insurance claim case in New York. The Supreme Court succinctly captured the impropriety of compensating witnesses for their testimony as follows:

> The very heart of the judicial system lies in the integrity of the participants.... Justice must not be bought or sold. Attorneys have a solemn responsibility to assure that not even the taint of impropriety exists as to the procurement of testimony before courts of justice. It is clear that the actions of the respondent in attempting to obtain compensation for the testimony of his clients ... violates the very essence of the integrity of the judicial system and the disciplinary rule and code of professional responsibility, the integration rules of the Florida Bar and the oath of his office.

*Jackson,* 490 So.2d at 936.

This sentiment amplifies the gross impropriety of Lloyds' conduct in this case. The evidence presented in the evidentiary hearing before the Special Master, as detailed above, overwhelmingly established that Lloyds, with the active assistance of its counsel Whitman & Ransom, paid Hollock and Lupovitz substantial sums of money to testify in this case. As the Supreme Court in *Jackson* expressed, "[j]ustice must not be bought or sold."

The Court's position is this case is consistent with those expressed in other jurisdictions. For example, one New York court has stated:

> Payment to a witness to testify in a particular way, payment of money to prevent a witness's attendance at a trial and the payment ... to make him sympathetic ...

are all payments which are absolutely indefensible.... *The payment of a sum of money to a witness to "tell the truth" is as clearly subversive of the proper administration of justice as to pay him to testify to what is not true.*

*In re Robinson,* 151 A.D. 589, 600, 136 N.Y.S. 548, 445 (1912), *affirmed,* 209 N.Y. 354, 103 N.E. 160 (1913) (emphasis added). An Illinois court has stated the following:

We will not tolerate payments of any sum of money by an attorney to witnesses for the opposition to secure or influence testimony, whether it be for the purpose of securing truthful testimony or otherwise.

*In re Kien,* 69 Ill.2d 355, 14 Ill.Dec. 365, 368, 372 N.E.2d 376, 379 (1977) (attorney suspended for 18 months). *See also, Wagner v. Lehman Bros. Kuhn Loeb Inc.,* 646 F.Supp. 643 (N.D.Ill.1986) (attorney disqualified for promising to remit a percentage of potential recovery in case to induce witness to tell the truth).

■ Rule 4–3.4(b) of the Rules of Professional Conduct, *The Florida Bar v. Jackson, supra,* and the aforementioned cases clearly prohibit a lawyer from paying or offering to pay money or other rewards to witnesses in return for their testimony, be it truthful or not, because it violates the integrity of the justice system and undermines the proper administration of justice. Quite simply, a witness has the solemn and fundamental duty to tell the truth. He or she should not be paid a fee for doing so.[11]

As previously stated, that Lloyds rather than its counsel was the actual source of the payments in this case is of no moment. The evidence clearly shows that Lloyds' counsel, Whitman & Ransom, played an active and extensive role in determining whether and in what monetary sum a particular individual should receive.

Under these circumstances and based on the evidence presented in this case, this Court can come to no other conclusion than that Lloyds' repeated payments of substantial sums of money to Hollock and Lupovitz

(a total of $493,103.00 to Hollock and $147,000 to Lupovitz) had an effect on the testimony they gave in this action. These acts of Lloyds and its counsel unquestionably violated the very heart of the integrity of the justice system. That Lloyds' willingness to pay was contingent on the condition that the testimony had to be helpful to Lloyds in its defense of this civil action makes even more pronounced the subversive and egregious nature of Lloyds' and its counsel's actions.

### Conclusion

Based upon the aforegoing, it is

ORDERED AND ADJUDGED that:

1. The Special Master's Memorandum Opinion and Recommendation, dated August 16, 1990 (the "Special Master's Report"), is hereby ADOPTED AND RATIFIED IN PART AND OVERRULED IN PART. Specifically, the Court ADOPTS AND RATIFIES the findings of fact contained in the Special Master's Report but REJECTS AND OVERRULES the conclusions of law and recommendations made therein.

2. Lloyds' payment in the total sum of $753,081.42 to witnesses, informants and intermediaries does not support a violation of 18 U.S.C. § 201(b)(3) or § 201(c)(2).

3. Of the total $753,081.42, Lloyds (with its counsel's knowledge and assistance) paid $120,000.00 to fact witnesses Ed Hollock and Abraham Lupovitz to testify at depositions in this civil action. Said conduct constitutes a clear violation of Rule 4–3.4(b) of the Rules of Professional Conduct, as adopted in Florida, and *The Florida Bar v. Jackson,* 490 So.2d 935 (Fla.1986).

■ 4. As the result of Lloyds' and its counsel's ethical violations, sanctions against Lloyds is warranted. The Court finds that the exclusion of all evidence tainted by the ethical violations is proper and appropriate. Accordingly, Lloyds SHALL not be permitted to submit into the evidence in this civil action the testimony given in this action by

---

11. Payments made to fact witnesses as actual expenses as permitted by law will not be disturbed or set aside. The Court's opinion today pertains only to payments made to fact witnesses for the purpose of obtaining their testimony in a case.

any of the fact witnesses who received monetary compensation from Lloyds.[12]

5. In accordance with paragraphs 2 through 4 above, Intervenor–Plaintiff Westway Metals Corp.'s Objections to the Special Master's Memorandum Opinion and Recommendation, file dated January 22, 1991; Leach & Garner Company's Exceptions to Special Master Latimer's Memorandum Opinion and Recommendations of August 16, 1990, file dated January 22, 1991; and Leach & Garner Company's Memorandum of Law in Opposition to Special Master Latimer's Memorandum Opinion and Recommendation of August 16, 1990, file dated October 5, 1994, are hereby GRANTED IN PART AND OVERRULED IN PART. To the extent the Court finds that Lloyds and its counsel have committed ethical violations, the objections and exceptions are hereby GRANTED. To the extent the Court finds that Lloyds and its counsel have not violated 18 U.S.C. § 201 and that Lloyds' pleadings should not be stricken, the objections and exceptions are hereby OVERRULED.

DONE AND ORDERED.

See also, 739 F.Supp. 1504.

12. Whether or not future and/or subsequent depositions of some or all of the fact witnesses cited herein may be permitted for some or all purposes shall be decided by the trial judge.