The STATE of NEW YORK, Plaintiff,

v.

SOLVENT CHEMICAL COMPANY, INC., ICC Industries, Inc., Mader Capital Corporation, 3163 Buffalo Avenue Corporation, and Corigan Sanoian, Individually and d/b/a Quad Technologies, Inc., Defendants.

SOLVENT CHEMICAL COMPANY, INC., ICC Industries, Inc., and Mader Capital Corporation, Defendants and Third–Party Plaintiffs,

v.

The UNITED STATES of America, et al., Third–Party Defendants.

No. 83–CV–1401C.

United States District Court, W.D. New York.

April 2, 1996.

Dennis C. Vacco, Attorney General of the State of New York (Robert Emmet Hernan, Assistant Attorney General, of counsel), New York City, for the State of New York.

Irwin F. Roth, New York City, for ICC Industries, Inc.

Damon & Morey L.L.P. (Mark G. Farrell, Charles Telford and R. Mark Keaton, of counsel), Buffalo, New York, for Solvent Chemical Company, Inc.

Duke, Holzman, Yaeger & Photiadis L.L.P. (Peter G. Ruppar, and George S. Van Nest, of counsel), Buffalo, New York, for Mader Capital, Inc.

Piper & Marbury (Anthony L. Young, of counsel), Washington, D.C., for Occidental Chemical Corporation.

Jack A. Gellman (Richard E. Stanton, of counsel), Niagara Falls, New York, for the City of Niagara Falls.

## DECISION AND ORDER

CURTIN, District Judge.

Before the court are (1) a joint motion by defendants Solvent Chemical Company ("Solvent") and ICC Industries ("ICC") for a protective order (Item 387), and (2) a joint cross-motion by the plaintiff State of New York ("the State") and defendants Occidental Chemical Corp. ("OCC"), Mader Capital, Inc. ("Mader") and the City of Niagara Falls ("the City") to compel the production of certain documents, and for other related relief (Item 393). Oral argument was held on February 22, 1996.

### BACKGROUND

This is a complex environmental lawsuit under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601 *et seq.*, and related state law. The State filed suit on December 9, 1983, against Solvent, ICC, Mader, and three other defendants, for the costs of investigation and clean-up of a site located at 3163 Buffalo Avenue, Niagara Falls, New York. The complaint alleges, *inter alia*, that Solvent operated an industrial chemical facility at the site from 1972 to 1979; that Solvent sold the site to Transit Holding Corporation ("Transit") in August 1978, but continued to operate there until January 1979; that Mader is a successor in interest to Transit; that ICC is the corporate parent and successor in interest to Solvent; and that in operating the site, Solvent released and disposed of large amounts of hazardous chemicals and chemical wastes onto the land and into the ground water.

In June 1986, Solvent, ICC, and Mader filed third-party complaints asserting CERCLA contribution and related claims against various third-party defendants, including

OCC and the City. Items 42–44. Thereafter, for several years, litigation proceeded only slowly. However, since the beginning of 1994, as investigation of the site has progressed and completion of a remedial action plan has drawn near, much has occurred. Additional parties have been brought in,[1] and the pace of discovery has increased.

Recently, discovery has been focused on the question of whether ICC may be held liable under CERCLA, either as an operator of the site or as the corporate parent of Solvent. The current dispute centers on ICC's retention of Eric Beu, a former employee of ICC and an important fact witness on these issues, as a litigation consultant.

In the mid to late 1970s, Mr. Beu was a vice-president of both ICC and Dover Chemical Corporation ("Dover"), a wholly owned subsidiary of ICC. He left ICC and Dover in 1979. A dispute developed over the circumstances of his departure. He brought an arbitration proceeding against ICC, and lost. Since that time, he has not worked in the chemical industry. In 1993, Dover filed a CERCLA action in the United States District Court, Northern District of Ohio, against several defendants, including Mr. Beu as a former owner (minority shareholder) and/or operator of Dover's facility in Dover, Ohio (*Dover Chemical Corp. v. Cohen*, Case No. 5:93–CV–1304 (N.D.Ohio) ("the Dover litigation")).

In early July 1995, OCC served a deposition subpoena on Mr. Beu. Upon learning that the subpoena had been served, ICC recognized that Mr. Beu possessed important information relating to Solvent's operations at the Buffalo Avenue site and to the nature of ICC's relationships with Solvent. The company's review of internal documents relevant to Solvent's operations revealed numerous memoranda written by or directed to Mr. Beu. Many of those documents contained handwritten notes made by Mr. Beu, which were indecipherable to ICC. Accordingly,

ICC, Solvent, and Dover approached Mr. Beu, through his counsel in the Dover litigation, and entered into various agreements with him. First, Dover settled its claims against him in the Dover litigation. Under the terms of the settlement, Mr. Beu agreed to pay Dover the sum of $4,000.00, and Dover agreed to indemnify Mr. Beu with respect to any claims made against him by other parties in that case. Second, ICC and Solvent made covenants not to sue Mr. Beu in the present action. And third, ICC and Mr. Beu entered into a written consulting agreement pursuant to which Mr. Beu was made part of ICC's trial team in this litigation. According to ICC and Solvent, under the terms of the consulting agreement Mr. Beu is required to assist ICC in reviewing and discussing with ICC and ICC's counsel the documentation relevant to the subject matter of the litigation. He receives payment of $100.00 per hour worked, plus out-of-pocket expenses. *See* Items 387–89.

Mr. Beu was deposed from November 7 to November 9, 1995, by counsel representing the State (Robert Hernan), OCC (Anthony Young), Mader (Peter Ruppar), the City (Richard Stanton), and the United States (Alan Birnbaum). Before the deposition, none of those parties were aware of the existence of the consulting agreement between ICC and Mr. Beu, or of the conditions under which Mr. Beu had agreed to cooperate with ICC. However, they had been informed that Mr. Beu was being represented by the law firm of Damon and Morey, counsel to Solvent in this action. At the deposition, Mr. Beu was represented by Paul Samson and Mark Keaton of Damon and Morey, and by Irwin Roth, counsel to both ICC and Solvent in this suit.

On the first day of deposition, OCC's counsel, Anthony Young, asked Mr. Beu whether, after late 1979, he had had any further business relationships with ICC, Dover, or Solvent. He replied that he had not.[2] None of

---

1. Amended third-party complaints, asserting claims against numerous additional third-party defendants, were filed in April 1994 and December 1995. Items 179, 181, 183, 390, 396.

2. The testimony proceeded as follows:

Q. And after late 1979 did you have any continuing relationship with ICC?
A. Define what you mean by—
Q. Did you work for ICC?
A. No.
Q. Did you consult for ICC?

the attorneys representing Mr. Beu, ICC, and/or Solvent made any attempt to intercede. On the third day of deposition, the City's counsel, Richard Stanton, asked Mr. Beu whether he had made any consulting arrangements with anyone in this litigation. He replied that he had, with ICC. Item 393, Young Declaration, ¶ 13 and Ex. J at 451. Mr. Stanton, Mr. Young, and Peter Ruppar, Mader's counsel, asked follow-up questions, and Mr. Beu testified that, under his agreement with ICC, he had spent one three-day and one three-to-four day session working at ICC's offices in New York City, for a total of between 20 and 50 hours; that at those sessions, he had worked with Irwin Roth, counsel to both ICC and Solvent in this litigation, Paul Falick, ICC's general counsel, and Paul Samson, then Solvent's counsel; that all had been carried out after he had received his deposition subpoena; that under the agreement, ICC had agreed not to sue him in this litigation, and had undertaken to pay him at the rate of $100.00 per hour for his time; and that he was not being compensated for the time spent giving deposition testimony. However, he was instructed by his counsel, Mark Keaton, not to answer questions concerning various aspects of his work under the agreement:

(1) the nature of the consulting services he had provided;

(2) whether he had looked at or been shown any documents relating to the Solvent facility;

(3) what work he had performed for ICC subsequent to the New York City meetings; and

(4) whether any time spent working for ICC subsequent to the New York City meetings was spent reviewing documents.

See Item 393, Young Declaration, ¶ 17 and Ex. J at 495–99.

A. No.
Q. Did you work for Solvent Chemical Corporation?
A. No.
Q. Did you consult for Solvent Chemical Corporation?
A. After 1979?
Q. Yes, sir.
A. No.
Q. And so after—this was late 1979?

The deposition subpoena served upon Mr. Beu commanded him to produce and permit inspection of "[a]ll documents or other written or printed matter referring or relating to the Solvent Chemical Company, Inc., [and] ICC Industries, Inc. . . . ." Item 393, Young Declaration, Ex. B. Following the instructions of his counsel, Mr. Beu did not bring his consulting agreement with ICC to the deposition. Id., Ex. J at 486, 490. At the time of the deposition, after disclosure of the existence of the agreement, Mr. Beu's counsel, Mark Keaton, was asked on what ground it was being withheld. Id. at 486. Mr. Keaton represented that it was privileged, since portions of the document contained material protected under the attorney work product doctrine. Id. at 486, 490–91, 503–04. He indicated that he would consider producing a redacted copy, if it proved feasible. Id. at 491–92, 502–04. He acknowledged that certain other materials relating to the agreement had been withheld—in particular, invoices for time spent by Mr. Beu under the agreement. Id. at 493–94. He also indicated that a request that ICC and Solvent produce copies or a list of all documents used by counsel or shown to Mr. Beu in preparation for his deposition would be considered.

At a previously scheduled meeting on November 13, 1995, four days after the events described above, the State's counsel, Robert Hernan, alerted the court to the dispute over the consulting arrangement between ICC and Mr. Beu. The court indicated to the parties that they should attempt to resolve the issue informally. They were unable to do so. Notably, in a letter dated November 13, 1995, Solvent's counsel, Mr. Keaton, informed Mader's counsel, Mr. Ruppar, that redaction was not possible, and "we will not produce the document in any form." Item .389, Ex. H. On November 27, 1995, after additional communications between the inter-

A. Yes.
Q. Do you recall the date?
A. Not the exact date, no.
Q. So it is your answer that after late 1979 you had no relationship, no business relationship with Dover Chemical Corporation, Solvent Chemical Corporation or ICC?
A. That's correct.
Item 393, Young Declaration, ¶ 12 and Ex. J at 22–23.

ested parties, ICC and Solvent brought a joint motion for an order declaring that the consulting agreement between ICC and Mr. Beu is protected from disclosure under Fed. R.Civ.P. 26(b)(3) and the attorney work product doctrine. Item 387. In support of their motion, ICC and Solvent asserted that "[n]otwithstanding the fact that the document is clearly protected from disclosure, certain parties have repeatedly requested production of the document and have threatened a motion to compel production." *Id.*, ¶ 13.

OCC, Mader, the State, and the City responded with their cross-motion to compel production on December 6, 1995. Item 393. Maintaining that the consulting agreement is not protected under the attorney work product doctrine or any other privilege, they seek an order directing ICC and Solvent to produce:

(1) a copy of the agreement (or a redacted copy if the document indeed contains privileged material);

(2) a copy of each document reviewed by Mr. Beu under the agreement, and any documents, notes, or other writings prepared by Mr. Beu under the agreement;

(3) copies (or a list) of all documents shown or provided by counsel to Mr. Beu in preparation for his deposition;

(4) notes of any conversations with Mr. Beu and/or other written communications with him.

*Id.* (Joint Motion to Compel). They also propose that the court direct ICC and Solvent to produce Mr. Beu for further deposition, and to pay counsel fees and all other expenses incurred by the parties in connection with that deposition. *Id.*

3. Fed.R.Civ.P. 26(b)(3) states, in relevant part, that:

a party may obtain discovery of documents and tangible things otherwise discoverable under subdivision (b)(1) of this rule and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has substantial need of the

## DISCUSSION

### 1. The Consulting Agreement and Related Documents

■ The work product rule "shields from disclosure materials prepared 'in anticipation of litigation' by a party, or the party's representative, absent a showing of substantial need." *United States v. Adlman*, 68 F.3d 1495, 1501 (2d Cir.1995) (citing Fed.R.Civ.P. 26(b)(3)).[3] "The purpose of the doctrine is to establish a zone of privacy for strategic litigation planning and to prevent one party from piggy-backing on the adversary's preparation." *Id.* In considering whether the protection of Fed.R.Civ.P. 26(b)(3) should apply, courts should:

consider whether, within the meaning of the rule, the [materials] were "prepared in anticipation of litigation," and if so, whether the [party seeking disclosure] has shown "substantial need of the materials." Fed.R.Civ.P. 26(b)(3). If discovery is warranted on the basis of these showings, the district court "shall protect against the disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation." *Id.*

*United States v. Adlman*, 68 F.3d at 1502.

ICC and Solvent maintain that the consulting agreement between ICC and Mr. Beu falls within the protection afforded by the work product rule, because it was prepared in the course of this litigation for purposes of ICC's preparation for trial, and it "unequivocally reflects the thoughts, mental impressions and opinions of counsel for ICC and Solvent and specifically sets forth their litigation strategy." Item 388, p. 7. The parties seeking disclosure, on the other hand, assert that the work product doctrine "was never intended to shield against disclosure the

materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.

kinds of arrangements ... whereby a party engages in a hasty courtship with a potentially hostile witness which culminates with his being engaged as a ... 'consultant' while under subpoena to give factual testimony at a deposition." Item 394, pp. 9–10. "The movants seek to obtain the consulting agreement and related documents which deal, not with legal theories and strategies of counsel for ICC and Solvent, but with the facts and circumstances surrounding Mr. Beu's retention as ICC's consultant and factual information which Mr. Beu provided to ICC, and which Solvent and ICC provided to Mr. Beu, regarding the operation of the Solvent facility and the relationship between Solvent and ICC." *Id.* at 11–12.

▇▇▇ The court has no difficulty in finding that the consulting agreement, and any related documents that may reveal the facts and circumstances surrounding Mr. Beu's retention as a litigation consultant by ICC, as well as the terms and conditions of his retention, are not protected from disclosure under the work product rule. The rule is intended to protect the privacy of litigants and their representatives only insofar as their conduct does not erode the integrity of the adversary process. *See Parrott v. Wilson,* 707 F.2d 1262, 1271 (11th Cir.) ("the purpose of the work product privilege is to protect the integrity of the adversary process; therefore, it would be improper to allow an attorney to exploit the privilege for ends that are antithetical to that process"), *cert. denied,* 464 U.S. 936, 104 S.Ct. 344, 78 L.Ed.2d 311 (1983); *Moody v. Internal Revenue Service,* 654 F.2d 795, 798–801 (D.C.Cir 1981). Here, the conduct of ICC, Solvent, and their counsel in relation to Mr. Beu has threatened to undermine the integrity of the adversary process in this case.

▇▇▇ It is clear, first of all, that the agreements entered into by ICC, Solvent, Dover, and Mr. Beu were designed to overcome the hostility between Mr. Beu and ICC resulting from the dispute over the circumstances of Mr. Beu's departure from ICC in 1979, and from the naming of Mr. Beu as a defendant in the Dover litigation. ICC and Solvent purchased Mr. Beu's cooperation in the instant case, by orchestrating the settlement of Dover's claims against him in the Dover litigation, by obtaining Dover's agreement to indemnify him with respect to any claims made against him by other parties in that case, and by undertaking not to sue him in the present action. Those actions were the equivalent of making cash payments to Mr. Beu as a means of making him "sympathetic" and securing his testimony.

To procure the testimony of witnesses it is often necessary to pay the actual expenses of a witness in attending court and a reasonable compensation for the time lost. It is often necessary to pay a reasonable fee to an expert in preparing to testify for a party in an action. And there are many incidental expenses in relation to the prosecution or defense of an action at law which can with propriety be paid by a party to the action. But on the other hand, the payment of a sum of money to a witness to testify in a particular way; the payment of money to prevent a witness' attendance at a trial; *the payment of money to a witness to make him "sympathetic" with the party expecting to call him; these are all payments which are absolutely indefensible and which are really included in the general definition of subornation of perjury.* The payment of a sum of money to a witness to "tell the truth" is as clearly subversive of the proper administration of justice as to pay him to testify to what is not true.

*In re Robinson,* 151 A.D. 589, 600, 136 N.Y.S. 548 (1st Dept.1912) (emphasis added), *aff'd,* 209 N.Y. 354, 103 N.E. 160 (1913). *See also, Golden Door Jewelry Creations, Inc. v. Lloyds Underwriters Non–Marine Association,* 865 F.Supp. 1516, 1525–26 (S.D.Fla. 1994); *Wagner v. Lehman Brothers Kuhn Loeb Inc.,* 646 F.Supp. 643, 656 (N.D.Ill. 1986); *The Florida Bar v. Jackson,* 490 So.2d 935 (Fla.1986); *In re Kien,* 69 Ill.2d 355, 14 Ill.Dec. 365, 368, 372 N.E.2d 376, 379 (1977). Of course, the court finds nothing improper in the reimbursement of expenses incurred by Mr. Beu in travelling to New York to provide ICC with factual information, or in the payment of a reasonable hourly fee for Mr. Beu's time. But in providing Mr. Beu with protection from liability in the

Dover litigation, and in this action, as a means of obtaining his cooperation as a fact witness, ICC and Solvent went too far.

Second, the impropriety of securing Mr. Beu's cooperation by the use of financial inducements (or their equivalent) has been compounded by the circumstances under which the transaction occurred. ICC must have been well aware, prior to OCC's serving of a subpoena on Mr. Beu, that Mr. Beu was an extremely important fact witness in this case. The company has been a defendant since the original complaint was filed in 1983. But it was only after service of the subpoena in July 1995—when it became clear that OCC and other parties were intending to obtain both documents and testimony from Mr. Beu—that ICC moved to acquire Mr. Beu's services as a "litigation consultant." The timing of ICC's actions creates, in and of itself, an appearance of impropriety that serves to further undermine the company's claim of work product protection for the consulting agreement and related materials. And ICC's identification of Mr. Beu as a member of its trial team inevitably raises concerns as to whether he can be counted on to testify fully and impartially on a key issue in this case—the extent to which ICC was involved in the operations of Solvent and the Buffalo Avenue site at the time the site was owned and/or operated by Solvent.

Third, it is most troubling that none of the attorneys representing ICC, Solvent, and/or Mr. Beu undertook to disclose, on their own initiative, either before or during Mr. Beu's deposition, that Mr. Beu had been retained as a consultant by ICC. As noted above, Mr. Beu was asked, on the first day of the deposition, whether he had had any business relationships with ICC, Dover, or Solvent after late 1979. *Supra*, n. 2. Neither Mr. Samson, nor Mr. Keaton, nor Mr. Roth made any attempt to clarify his answer when he stated that he had not.

And finally, ICC's strong resistance to production of the consulting agreement is perturbing in itself. The basis for its claim of work product protection is that the agreement "contains and reflects ICC's litigation strategy and the thoughts, mental impressions and opinions of ICC's counsel." Item 389, ¶ 11. The court is at a loss as to why ICC would incorporate such sensitive information in a written contract with an important fact witness. It must have been obvious at the time the contract was drafted that other parties to the litigation would be disturbed by the existence of the agreement, and would be likely to seek production of the document. It may be that the agreement sets forth the contours, and even some details, of Mr. Beu's responsibilities as a "litigation consultant," and that such provisions might in themselves reveal something of ICC's litigation strategy. But the impropriety of ICC's conduct in relation to Mr. Beu dictates that the company must forfeit any protection that it might otherwise claim to such information.

ICC and Solvent place great reliance on two cases, *Barrett Industrial Trucks, Inc. v. Old Republic Insurance Co.*, 129 F.R.D. 515 (N.D.Ill.1990), and *In re Gulf Oil/Cities Service Tender Offer Litigation*, 1990 WL 108352 (S.D.N.Y.1990). That reliance is misplaced. In each of those cases the court appears to have accepted, without comment, that there was nothing improper in a party hiring, as a litigation consultant, a former employee who was also a fact witness in the litigation. However, there is nothing in either case to suggest that the former employee had been retained under circumstances remotely resembling those under which Mr. Beu was hired in the present action.

In *Barrett*, there was no indication that the former employee, Herman Kornatz, was likely to be a hostile witness, or that his cooperation had been secured by means of financial inducements or the equivalent.[4] Furthermore, there was nothing else in *Barrett* to suggest impropriety in the circumstances under which Mr. Kornatz was hired. The court indicated merely that he had been retained a few months after the suit was filed. *Barrett*

---

4. The *Barrett* court noted only that Kornatz was to paid a fee of $50.00 per hour for his consulting services. *Barrett Industrial Trucks, Inc. v. Old Republic Insurance Co.*, 129 F.R.D. at 516.

As indicated above, there is nothing improper about the payment of a reasonable hourly fee for the services of a fact witness.

*Industrial Trucks, Inc. v. Old Republic Insurance Co.*, 129 F.R.D. at 516. Unlike the present case, there was no suggestion that the former employer acted with haste to secure his cooperation after the service of a deposition subpoena by other interested parties. *Id.* And there was no indication that the former employer resisted discovery of the consulting agreement (which in *Barrett* was simply an oral one). *Id.*

In *Gulf Oil*, there was a dispute over the depositions of two of defendant Gulf Oil Corporation's former employees. Much of the dispute concerned a former officer of the corporation, E.M. Miller. Mr. Miller was an important fact witness in the case. Prior to his deposition by the plaintiffs, he attended a meeting with Gulf's attorneys, in order to discuss matters about which he subsequently testified at the deposition. *In re Gulf Oil/Cities Service Tender Offer Litigation*, 1990 WL 108352 at *1, *3. He was paid for his travel expenses and time, *id.* at *1, but evidently was *not* hired by Gulf as a consultant. The court held that the content of the pre-deposition discussions was protected under the work product doctrine, and that the plaintiffs had failed to show that the circumstances warranted setting aside Gulf's work product claim. *Id.* at *3–*5. The plaintiffs had apparently alleged that the discussions were directed towards concocting a false story for Mr. Miller, but the court found that there was nothing to support such an allegation. *Id.* at *4–*5. The plaintiffs also claimed that a "malign purpose" was evidenced by a generous severance package when Mr. Miller left Gulf's employ six years before. *Id.* at *5. The court made short shrift of that contention, finding that there was no evidence that the severance package had been unusually large, and that even if it had been, no inference could be drawn that it was designed to influence Mr. Miller's testimony in subsequent litigation. *Id.* The circumstances surrounding the dispute over Mr. Miller's deposition in *Gulf Oil* were, therefore, quite unlike those surrounding the dispute over ICC's retention of Mr. Beu in the present case.

The second former-employee fact witness in *Gulf Oil*, Charles Mace, who *was* hired as a litigation consultant by Gulf, was mentioned only in passing in the decision. *In re Gulf Oil/Cities Service Tender Offer Litigation*, 1990 WL 108352 at *1, *4, *7. Nothing was noted about the circumstances, terms, or conditions under which he had been retained. He was evidently viewed as a fact witness friendly to Gulf, *id.* at *4, and there seems to have been no serious allegation that Gulf had acted improperly in hiring him.

ICC and Solvent's reliance on *Barrett* and *Gulf Oil* therefore fails. The consulting agreement between ICC and Mr. Beu, and all related documents that may reveal the facts and circumstances surrounding Mr. Beu's retention as a consultant by ICC, as well as the terms and conditions of his retention, are not protected under the work product doctrine, and must be produced by ICC to the parties seeking disclosure.

### 2. Documents Reviewed In Preparation for Deposition

The parties moving to compel production seek an order directing ICC and Solvent to produce copies (or a list) of all documents shown or provided by counsel to Mr. Beu in preparation for his deposition. Item 393 (Joint Motion to Compel). In opposition, ICC and Solvent cite the Third Circuit's decision in *Sporck v. Peil*, 759 F.2d 312 (3d Cir.) (holding that under certain circumstances, an attorney's selection and ordering of documents to show to his client prior to deposition may be protected as work product, even though the documents themselves are subject to discovery), *cert. denied*, 474 U.S. 903, 106 S.Ct. 232, 88 L.Ed.2d 230 (1985).

The Second Circuit has accepted the *Sporck* principle, though describing it as "creating only a 'narrow exception' to the principle that documents do not acquire protection simply by being transferred by client to attorney." *In re Grand Jury Subpoenas Dated October 22, 1991, and November 1, 1991*, 959 F.2d 1158, 1166–67 (2d Cir.1992) (citing *Gould Inc. v. Mitsui Mining & Smelting Co., Ltd.*, 825 F.2d 676 (2d Cir.1987)). But *Sporck* is inapplicable here: any work product protection that might have been available to ICC and Solvent under *Sporck* is vitiated by ICC's improper action in retain-

ing Mr. Beu as a litigation consultant, on terms notably favorable to Mr. Beu, immediately upon learning that he had been served with a deposition subpoena by another party to the litigation. Accordingly, ICC and Solvent must disclose, to the parties seeking production, the identity of all documents shown or provided to Mr. Beu in preparation for his deposition.

### 3. Documents Reviewed and Prepared under the Consulting Agreement

■ The parties moving to compel also seek an order directing ICC and Solvent to produce (1) a copy of each document reviewed by Mr. Beu under the consulting agreement, (2) any documents, notes or other writings prepared by Mr. Beu under the agreement, and (3) notes of any conversations between ICC and/or Solvent and Mr. Beu, and any other written communications with him. Item 393 (Joint Motion to Compel). Their request must be granted, for essentially the same reason that ICC and Solvent must disclose the identity of documents shown to Mr. Beu before deposition: any work product protection that ICC and Solvent might otherwise claim in the identity of the documents reviewed by Mr. Beu under the agreement, in any documents, notes, or writings prepared by him under the agreement, and in any communications between ICC and/or Solvent and Mr. Beu, is vitiated by ICC's purchasing of Mr. Beu's cooperation as a fact witness in this case.

### 4. Further Deposition of Mr. Beu

Finally, the parties moving to compel seek an order requiring ICC and Solvent (1) to produce Mr. Beu for further deposition, and (2) to pay counsel fees and all other expenses incurred by the movants in connection with that deposition. Item 393 (Joint Motion). They submit that they have not been able to obtain adequate information concerning either the consulting services provided to ICC by Mr. Beu, or the documents reviewed by Mr. Beu as part of his consulting services or in preparation for deposition. Item 394, pp. 22–23.

Again, the request is well founded, and will be granted. At his earlier deposition, Mr.

Beu was instructed by his counsel (who was, and is, also counsel to Solvent) not to respond to questions concerning the nature of the consulting services he had provided to ICC. He must now be required to do so. Leave to further depose Mr. Beu is granted pursuant to Fed.R.Civ.P. 30(a)(2). ICC and Solvent will bear all fees and costs incurred by the parties moving to compel in connection with that deposition.

### CONCLUSION

For the reasons given above, ICC and Solvent's motion for a protective order (Item 387) is denied. The cross-motion of the State, OCC, Mader, and the City to compel (Item 393) is granted. ICC and Solvent are directed:

(1) To produce the consulting agreement between ICC and Mr. Beu, and all related documents that may reveal the facts and circumstances surrounding Mr. Beu's retention as a consultant by ICC and the terms and conditions of his retention, for inspection by the parties seeking production;

(2) To produce all documents shown or provided to Mr. Beu in preparation for his deposition, or, if satisfactory to the parties seeking production, a list of all such documents;

(3) To produce all documents reviewed by Mr. Beu under the consulting agreement, or, if satisfactory to the parties seeking production, a list of all such documents;

(4) To produce all notes or writings prepared by Mr. Beu under the consulting agreement, and all records of communications between ICC and/or Solvent and Mr. Beu under or concerning the agreement;

(5) To pay all fees and costs incurred by the parties moving to compel in connection with the further deposition of Mr. Beu.

So ordered.