CENTENNIAL MANAGEMENT SER-
VICES, INC., Plaintiff/Counter-
claim Defendant,

v.

AXA RE VIE, Axa Re Life Insurance
Company and Axa Reassurance, De-
fendants/Third–Party Plaintiffs,

v.

Centennial Financial Group, Inc., William
E. Vogel, Thomas L. Enstrom, Jardine
Group Services Corporation and James
A. Irwin, Third–Party Defendants.

No. 97–2509–JWL.

United States District Court,
D. Kansas.

March 10, 2000.

Douglas J. Schmidt, Terrance M. Summers, Blackwell, Sanders, Peper, Martin, LLP, Kansas City, MO, Daniel M. Dibble, Thomas S. Stewart, Michael J. Abrams, Lathrop & Gage, L.C., Kansas City, MO, for plaintiffs.

Frank Wendt, Michael E. Waldeck, Angela K. Green, Niewald, Waldeck & Brown, P.C., Reggie C. Griffin, Morrison & Heckler L.L.P., Kansas City, MO, Thomas M. Regan, Cozen & O'Connor, Philadelphia, PA, Steven J. Boyd, Badger & Levings, L.C., Kansas City, MO, Christopher B. Kende, Edward Hayum, Cozen & O'Connor, New York City, for defendants.

## MEMORANDUM AND ORDER

LUNGSTRUM, District Judge.

Centennial Management Services, Inc. ("CMS"), the sole shareholder of Centennial Life Insurance Company ("CLIC"), an insurer, filed this action against CLIC's reinsurers, Axa Re Vie, Axa Reassurance, S.A. and Axa Re Life Insurance Company (collectively "Axa") asserting various contract and tort claims arising out of Axa's purported breach of certain reinsurance agreements with CLIC and related alleged misconduct. Axa, in turn, filed various counterclaims against CLIC and CMS and filed a third-party complaint against, *inter alia*, the reinsurance brokers, James Irwin and Jardine Group Services Corporation.

This matter is presently before the court on plaintiff's and third-party defendants' (hereinafter "Movants") joint motion for sanctions against Axa and Axa's counsel (doc. #298). Specifically, the Movants contend that Axa and its counsel engaged in a "calculated scheme" to "buy" the cooperation and testimony of its critical fact witness, Daniel Grao. According to the Movants, this "scheme" violates common law and public policy against paying fact witnesses, violates the federal anti-gratuity statute, *see* 18 U.S.C. § 201(c)(2), and violates Model Rule of Professional Conduct 3.4(b). The Movants request that the court strike Axa's answer, affirmative defenses, counterclaims and third-party complaints and enter default judgments in favor of the Movants on all issues and claims. In the alternative, the Movants request that the court enter an order prohibiting Axa from offering any of Mr. Grao's testimony at trial or, at the very least, admitting into evidence at trial all of the documents produced by Axa during the course of discovery on the Movants' motion for sanctions. Finally, the Movants suggest that any sanction should include awarding the Movants attorneys' fees and costs incurred in filing and pursuing their joint motion.

Axa and its counsel vigorously deny any wrongdoing and, in turn, ask the court to impose sanctions against the Movants. In that regard, Axa asserts that the Movants knowingly invaded the consulting and attor-

ney-client relationships between Mr. Grao and Axa's counsel in violation of Model Rule of Professional Conduct 4.2 and the rules governing discovery of trial consultant and expert witness information. By way of relief, Axa requests that the court require the Movants to disgorge all remaining notes and memoranda documenting their communications with Mr. Grao and preclude the Movants from introducing evidence of their allegedly improper communications with Mr. Grao at trial. Axa further maintains that sanctions against the Movants' counsel are warranted to penalize counsel for their oppressive and malicious litigation tactics. Specifically, Axa criticizes the Movants' counsel for their continued accusations of criminal misconduct in the absence of any factual or legal support for those accusations. As a remedy for this "witch-hunt," as Axa describes it, Axa requests that the court require the Movants' counsel personally to reimburse Axa its attorneys' fees and costs incurred in connection with responding to the allegations raised in the Movants' motion for sanctions.

As set forth in more detail below, the Movants' motion for sanctions is denied. Similarly, Axa's request for sanctions against the Movants is denied.

## I. Procedural History

In September 1999, plaintiff and third-party defendants ("Movants") filed a joint motion for sanctions against the Axa defendants after the Movants learned from an intermediary (who was not identified in the motion) that the testimony of a key Axa witness "may have been influenced" by the payment of money to him by Axa and/or Axa's counsel and that the witness was allegedly paid "l'argent pour me taire" or "hush money" by Axa and/or Axa's counsel. The Movants requested the court to enter default judgment against Axa on all claims. In the alternative, the Movants sought an order from the court reopening discovery for the limited purpose of exploring any agreements between Axa or its counsel and the key witness concerning the witness's testimony and any payments made to the witness. Axa filed a response to the motion in which it denied any wrongdo-

ing and asserted that the witness had been reasonably compensated pursuant to the terms of a consulting agreement entered into between the witness and Axa's counsel.

In November 1999, after the Movants' motion was fully briefed by all parties, the court held a telephone conference in which it advised the parties that it was unwilling to render a decision on the merits of the motion based on the limited record before it. Thus, the court granted in part and denied in part the Movants' request for discovery on certain limited issues. Discovery occurred between the Movants and Axa over the course of several weeks in December 1999. In January 2000, after discovery was complete, the court ordered the Movants to file any supplemental briefing with respect to their initial motion ·for sanctions by February 11, 2000 and ordered Axa to file any response within the time provided under the Federal Rules of Civil Procedure.

The Movants and Axa have supplemented their initial papers. Neither side has requested an evidentiary hearing on the motion; rather, the parties have submitted the issue to the court on the basis of affidavit testimony, deposition testimony and documentary evidence. Thus, in determining whether the conduct of Axa or its counsel warrants the imposition of sanctions (or whether the conduct of the Movants or their counsel warrants the same), the court necessarily makes certain factual findings and credibility assessments based on the record before it. *See In re Cascade Energy & Metals Corp.*, 87 F.3d 1146, 1149 (10th Cir. 1996) (in deciding whether an attorney has engaged in sanctionable conduct, the district court must make credibility assessments and factual findings). The relevant facts as the court finds them are set forth below.

## II. Factual Background

In October 1993, Daniel Grao became the Senior Vice President of defendant Axa and the head of Axa's Life Insurance Department. In that capacity, Mr. Grao negotiated the original reinsurance agreements between Axa and CLIC—agreements on which this litigation is grounded. Mr. Grao continued to have direct supervision over Axa's reinsur-

ance program with CLIC until Axa terminated Mr. Grao's employment in September 1997. Mr. Grao vigorously protested his dismissal from Axa.

At the time that Axa discharged Mr. Grao, it entered into certain agreements with him. First, Axa agreed that the Directors and Officers (D & O) policy underwritten for the benefit of Axa executives would continue to protect Mr. Grao until June 30, 1998.[1] In exchange, Mr. Grao agreed to cooperate and consult with Axa through June 30, 1998 with respect to any files with which he was familiar. Second, Axa and Mr. Grao entered into a settlement agreement in which Axa agreed to continue paying Mr. Grao his regular compensation for six months following his termination date.[2] In exchange for Mr. Grao's promise not to sue Axa with respect to his termination, Axa agreed to pay Mr. Grao an additional sum of 600,000 francs.[3]

In October 1998, Joelle de Lacroix, Axa's general counsel, contacted Mr. Grao about the Centennial litigation (i.e., the lawsuit pending before this court), which had commenced shortly after Mr. Grao's termination. Specifically, Ms. de Lacroix discussed with Mr. Grao the need for his expertise and consulting assistance with respect to the subject matter of the litigation—the reinsurance agreements between CLIC and Axa. Mr.

Grao reminded Ms. de Lacroix that his agreement to provide assistance to Axa had lapsed on July 1, 1998. He advised her that he was no longer willing to work with Axa or its counsel absent a consulting agreement.

Accordingly, Axa's counsel (Ms. de Lacroix; Christopher Kende of the Cozen & O'Connor firm in New York; and Michael Waldeck of the Niewald, Waldeck & Brown firm in Kansas City) met with Mr. Grao in Paris to discuss the status of the case and Mr. Grao's upcoming deposition. Mr. Grao confirmed that he would not make himself available for further consultation or use of his expertise—and that he would not voluntarily appear for his January 1999 deposition—unless Axa's counsel agreed to negotiate a consulting agreement to compensate Mr. Grao for his time away from other matters and for the assistance and expertise Axa's counsel desired.

After several weeks of negotiations through a series of letters between Mr. Grao and Axa's counsel, Mr. Grao eventually agreed to the terms of his retention by Cozen & O'Connor, as set forth in a letter Consulting Agreement dated December 18, 1998 and signed by Mr. Grao on December 19, 1998.[4] The Agreement contained Mr. Grao's commitment to provide, from the date of the Agreement until the earlier of the entry of

---

1. The D & O policy protected Mr. Grao from any action filed against him by a third-party concerning the duties Mr. Grao performed in his capacity as an Axa executive.

2. This payment, however, was required by French law. According to Axa's undisputed evidence, French law requires that any employee who is terminated, unless guilty of serious or gross misconduct, is entitled to a "notice indemnity" to be determined by law or by collective bargaining agreement. Pursuant to the Collective Bargaining Agreement for Executives of Insurance Companies, Axa was required to give Mr. Grao a notice indemnity equivalent to six months' salary.

3. Like the notice indemnity, this payment was required. French law requires that a discharged employee, unless guilty of serious or gross misconduct, receive a "dismissal indemnity" in addition to the notice indemnity. The dismissal indemnity paid to Mr. Grao—representing another six months' salary—was made in accordance with the terms of the governing Collective Bargaining Agreement.

4. The Movants suggest that Mr. Grao agreed to Axa's terms as set forth in the December agreement only after Axa's counsel had "threatened" to expose Mr. Grao to personal liability and significant personal expense if he did not agree to "help" Axa. In support of this assertion, the Movants direct the court to a letter from Mr. Kende to Mr. Grao in which Mr. Kende cautioned Mr. Grao that if he failed to appear voluntarily at his deposition, he would "run the risk of being named individually in the action." Axa, however, has presented evidence demonstrating that the threat to expose Mr. Grao to personal liability originated with counsel for CMS when they, along with counsel for CLIC's liquidator, advised Axa's counsel that they were considering naming Mr. Grao as an individual defendant if he did not agree to voluntarily appear for his deposition. Against this background, coupled with a review of the full text of Mr. Kende's letter, the court is unwilling to draw the inference that the Movants suggest.

judgment or July 1, 2000, expert and consulting services, particularly in the reviewing of documents and deposition transcripts, attending depositions of witnesses and preparing for and attending his deposition and trial. Pursuant to the Agreement, Mr. Grao was to be reimbursed for reasonable and necessary out-of-pocket expenses and compensated for his services at an hourly rate that was tiered as follows: $125 per hour for the review and study of documents and deposition transcripts; $150 per hour for the attendance at meetings and in preparation for testimony; and $200 per hour for testifying at a deposition or trial. The Agreement further provided that Mr. Grao would be paid a minimum daily fee of $750 for any services provided outside of France. Travel time was not included. In addition to terms concerning compensation, the Agreement contained Cozen & O'Connor's commitment to represent Mr. Grao at his deposition and at trial at no cost to Mr. Grao. Finally, the parties agreed that Axa's D & O policy would protect Mr. Grao for purposes of his deposition and at trial.

Axa's counsel also agreed to pay Mr. Grao, at his request, a lump-sum payment of $20,000 in advance, to be credited against future services. This payment, according to the Agreement, was nonrefundable. Mr. Kende averred that Axa's decision to pay Mr. Grao the $20,000 sum in advance was made only after careful consideration concerning the amount of time that Axa projected Mr. Grao would spend in connection with the litigation. According to Mr. Kende, Axa's counsel anticipated that they would need approximately 300 hours of Mr. Grao's time during the litigation process. This projection was based on the length of Mr. Grao's deposition testimony (which Axa's counsel understood from the Movants' counsel would take several days); the need for Mr. Grao's assistance in preparing for the depositions of approximately 20 witnesses; the need for Mr. Grao's assistance in analyzing many of the 100,000 documents that had been produced in the litigation; and Mr. Grao's possible trial testimony. Based on the projection of 300 hours, Axa and its counsel concluded that Mr. Grao's demand for a $20,000 advance payment was reasonable because, assuming Axa's projection was accurate, Axa and its counsel would eventually be obligated to pay Mr. Grao a sum well in excess of $20,000 pursuant to the terms of the Agreement.

According to the language of the Agreement, the $20,000 advance was due to Mr. Grao immediately upon his signing the Agreement. In fact, Mr. Kende averred that he intended to pay Mr. Grao this sum at the time Mr. Grao executed the Agreement. Mr. Kende, however, experienced significant delays in receiving the money from Axa. According to Mr. Kende, he had to wait for the funds to be transferred from Axa to Cozen & O'Connor before the firm could pay Mr. Grao. Moreover, additional time was needed to get the appropriate payment to Mr. Grao because he had requested payment in French Francs. As of January 19, 1999, Mr. Grao had not yet received the lump-sum payment. On that day, Mr. Grao communicated with Mr. Kende via electronic mail that he "needed" the payment by Friday, January 22, 1999 "at the latest." Mr. Grao's message implied that, without payment, he would not voluntarily appear for his deposition, scheduled to begin on January 26, 1999. Mr. Kende, at least, inferred as much from the message. The next day, he sent an "urgent" request via facsimile to Bob Reeder, an attorney in Cozen & O'Connor's Philadelphia office, in which he stated as follows:

> This case involves a reinsurance dispute in federal court in Kansas. We act for AXA Re and the amount in issue is substantial, probably in excess of $50 million. The primary underwriter of this account is no longer employed by our client. Consequently, we have agreed to compensate him on an hourly basis for his time as a consultant. His deposition is scheduled for next week in Paris and the agreement provides that he is to be paid a minimum fee on or before his deposition of $20,000. We have requested to be put in funds for him this amount by AXA and I am assured by Joelle de Lacroix that the request has been approved and that the funds are in the process of being wired. However, they have not yet arrived and I am very concerned that we will not be able to issue the

check and deliver it to the witness within the time frame agreed. As a result, I would request that we take it upon ourselves to issue the check to the witness in anticipation of receipt of the funds which will, I am sure, be paid shortly.... [T]his check request ... must be processed immediately, so that I am able to deliver the check to him on Monday prior to his deposition.

In response, Mr. Reeder expressed some concern about whether Mr. Grao had signed any written agreement "as to what he is going to do with this $20,000." Mr. Kende, in turn, responded that he was "not happy that we have had to negotiate an agreement with a former employee who normally should be appearing voluntarily," but he assured Mr. Reeder that the arrangement was in keeping with similar arrangements that Mr. Kende had made with numerous other consultants and experts. Mr. Kende further assured Mr. Reeder that the $20,000 figure "will no doubt be exceeded since he is being paid approximately $125 per hour for his time and has already run up in excess of 150 hours reviewing documents and attending meetings in preparation for his deposition." Finally, Mr. Kende explained to Mr. Reeder the rationale for the agreement:

The rationale for the agreement is that the individual, who is currently working freelance, is being taken away from other remunerative work and that he is being compensated for the time necessary to devote to this matter, as well as for his expertise, since it is time that cannot be charged to other remunerative activities.

Apparently satisfied with Mr. Kende's response, Mr. Reeder delivered the check to Mr. Kende, who then hand-delivered the check to Mr. Grao on Monday, January 25, 1999—the day before Mr. Grao's deposition commenced. Mr. Kende averred that, at the time he delivered the check to Mr. Grao, he had already received a statement of Mr. Grao's time, dated January 11, 1999, reflecting that Mr. Grao had devoted in excess of 143 hours of his time and, thus, had earned $17,906 under the terms of the Agreement.[5]

On February 23, 1999, Mr. Grao faxed an invoice to Mr. Kende showing a total amount owed under the Agreement of $43,593.50. This amount represented $17,906 for time spent from the date of the Agreement through January 11, 1999 and an additional $25,687.50 for time spent from January 11, 1999 through the date of the invoice, February 23, 1999. On the invoice, Mr. Grao noted that the "outstanding balance due to date is $23,593.50." Although the invoice itself is silent on the issue, the Movants and Axa agree that the $23,593.50 balance reflects a credit of the $20,000 lump-sum payment that Mr. Grao had already received. According to the Agreement, payment for this invoice was due 45 days after its submission, or April 9, 1999.

April 9, 1999 passed without any further payment to Mr. Grao. On April 15, 1999, Mr. Grao submitted another invoice to Mr. Kende. This invoice, reflecting time that Mr. Grao spent from February 24, 1999 through April 13, 1999, requested payment in the amount of $7,390 plus expenses. On May 17, 1999, Mr. Grao sent a message to Mr. Kende, via electronic mail, in which he summarized his apparent efforts to obtain payment of the $23,593.50.[6] In the message, Mr. Grao advised Mr. Kende that Cozen & O'Connor was nearly 40 days late in paying the amount due on the February invoice. Mr. Grao further advised that payment on the April invoice of $7,390 plus expenses would be due on May 29, 1999. In conclusion, Mr. Grao demanded that Cozen & O'Connor pay within one week all balances due to him, or $30,983.75.[7]

5. Although Mr. Grao submitted a statement of his time on January 11, 1999, he did not submit an invoice for this time until February 23, 1999.

6. Perhaps an oversight, Mr. Grao's message references the amount owed as $23,593.75 rather than $23,593.50. The invoice itself, however, reflects the amount as $23,593.50. Moreover, all parties have agreed the amount owing was $23,-593.50.

7. The Movants suggest in their papers that payment to Mr. Grao was delayed, at least in part, because Joelle de Lacroix was "disgusted" with Mr. Grao's "excessive" billing and because she was concerned about the fact that Mr. Grao had failed to generate any work product. This argument is based on two documents in the record. The first is a facsimile from Ms. de Lacroix to Mr. Kende in which Ms. de Lacroix asks two questions about "DG's bill": "Did you get any

Shortly thereafter, Cozen & O'Connor began processing Mr. Grao's invoice.[8] According to Mr. Kende, he delegated the responsibility of verifying the amounts on invoices with the amounts actually owed to his staff and the firm's accounting department. In any event, Mr. Grao's invoice was processed for $43,593.50 instead of $23,593.50—the $20,000 advance was not taken into account. A check in the amount of $43,593.50 was mailed to Mr. Grao on June 1, 1999. At no time did Mr. Grao indicate that he had been overpaid.[9] In late July 1999, Cozen & O'Connor sent Mr. Grao payment for the invoice he submitted in April 1999.

In August 1999, Mr. Grao, acting through an intermediary, contacted third-party defendant Jardine. The intermediary advised Jardine that he had been contacted by Mr. Grao and that, according to Mr. Grao, he had been paid by Axa to "keep quiet" and that he now wanted to meet with representatives of Jardine in order to tell the truth. Vyvienne Wade of Jardine met with Mr. Grao and the intermediary in Paris on August 31, 1999. According to Ms. Wade, Mr. Grao explained that he contacted Jardine because he was "very unhappy" with the way in which Axa was treating him. Ms. Wade averred that Mr. Grao stated that Axa was preventing him from procuring other employment. In essence, Mr. Grao offered to sell to Jardine information that, in Mr. Grao's view, was damaging to Axa's case. In that regard, according to the affidavit of Ms. Wade, Mr.

Grao stated that "there were some areas in which he felt Axa's case was very weak, but which had not come out so far." He further stated, according to Ms. Wade, that he would share details of these issues with Jardine if Jardine "would strike a deal with him." Mr. Grao stated that he would not tell Ms. Wade anything about these "weak areas" unless Jardine paid him.

During their conversation, Mr. Grao also claimed that the Cozen & O'Connor firm paid him a $50,000 lump-sum payment; that he was told by the firm to avoid testifying in his deposition about critical facts that were detrimental to Axa; that certain Axa documentation was missing at his deposition; that he expressed a desire in June 1999 to contact the Movants about factual information that was not disclosed in his deposition but that Mr. Kende advised him not to do so; and that he was paid an additional sum of money as "l'argent pour me taire" or "money to keep quiet." This additional money, according to what Mr. Grao told Ms. Wade, was provided on the condition that Mr. Grao not contact any of the other parties in the litigation.

Ms. Wade reported the substance of her discussion with Mr. Grao to Robert Cotter, counsel for Jardine. Mr. Cotter then shared this information with counsel for plaintiff CMS and the other third-party defendants. In an effort to obtain further corroboration of the statements made by Mr. Grao to Ms. Wade, Michael Abrams, counsel for CMS,

---

answer to your queries? What do we want to do if you do not have any work product?" The second document is an electronic mail message to Mr. Grao in which Ms. de Lacroix, through Mr. Kende's office, requests that Mr. Grao send his original invoices and receipts to her.

The court is unpersuaded by the Movants' loose interpretation of these documents. The facsimile contains no other reference to Mr. Grao's bills and no explanation as to what Mr. Kende's "queries" were. In the absence of any other evidence bearing on Ms. de Lacroix's alleged concerns, the court is unwilling to infer from these two questions that Ms. de Lacroix was "disgusted" by Mr. Grao's "excessive" billing. Similarly, the court is unwilling to infer from the e-mail message that Ms. de Lacroix had reservations about Mr. Grao's billing practices. In fact, Axa's undisputed evidence demonstrates that Ms. de Lacroix made this request in an effort to process Mr. Grao's invoices more quickly.

8. Although the record is not entirely clear, it appears that Cozen & O'Connor, at least with respect to the arrangement with Mr. Grao, would submit the amount due to Axa (with accompanying time statements); that Axa would then transfer the appropriate funds to Cozen & O'Connor; and then Cozen & O'Connor would issue a check to Mr. Grao.

9. Mr. Kende averred that he did not recognize the overpayment to Mr. Grao until after he received the Movants' motion for sanctions and more thoroughly compared Mr. Grao's invoices with the payments made to him. When the overpayment was confirmed, Cozen & O'Connor immediately contacted Mr. Grao and demanded repayment. Although Mr. Grao initially refused to remit the overpayment, the record reflects that Mr. Grao, in December 1999, repaid the amount to Cozen & O'Connor.

met with Mr. Grao in Paris on September 8, 1999. According to Mr. Abrams, Mr. Grao confirmed many of the statements made to Ms. Wade. He explained to Mr. Abrams that he was "disappointed" with the way that Axa was dealing with him. Specifically, Mr. Grao was attempting to establish an insurance brokerage with English colleagues. Apparently, these colleagues informed Mr. Grao that Axa would sever its multi-million dollar relationship with the English brokerage firm if Mr. Grao were involved. Moreover, according to Mr. Abrams' affidavit, Mr. Grao advised Mr. Abrams that he had been paid a lump-sum payment of $20,000 over and above his hourly rate; that Axa had withheld information regarding its mutual release and dismissal of former third-party defendant Yves Ganansia; and that he had evidence that would be "devastating" to Axa's case that he could not share absent payment from the Movants. Mr. Grao further stated to Mr. Abrams that he "wanted" to provide testimony that would be "favorable" to the Movants, but that he would only do so if a "deal could be struck."

These discussions with Mr. Grao prompted the Movants to file their joint motion for sanctions. Upon learning of the motion, Mr. Grao sent a letter to Cozen & O'Connor in which he denies making any of the statements set forth above to the Movants or their representatives. Specifically, Mr. Grao asserted that it was "ridiculous to imagine" that he received any sum of money for any reason other than acting as an expert witness in the case.

### III. The Movants' Request for Sanctions Against Axa

The Movants' initial request for sanctions was based on their assertion that Axa and/or its counsel had paid "hush money" to Mr. Grao. Based on this assertion, which was reasonable at the time in light of the state-

ments Mr. Grao made in August and September 1999, the court permitted the Movants to engage in discovery on the limited issue of whether Mr. Grao had been paid "hush money" by Axa or its counsel. This discovery, however, revealed that neither Axa nor its counsel paid Mr. Grao "l'argent pour me taire." What is presented here is that Mr. Grao is a disgruntled former employee of Axa who, either in an effort to retaliate against Axa for purportedly interfering with Mr. Grao's business ventures or in an effort to fill his pockets, lied to the Movants.

For this reason, perhaps, the Movants have not vigorously pressed their original assertion that Mr. Grao had been paid "hush money." In their supplemental papers filed after discovery, the Movants have set forth a new theory for imposing sanctions on Axa and its counsel—an alleged scheme to "buy" the testimony of Mr. Grao, a scenario which is also plausible in light of Mr. Grao's proposals to Ms. Wade and Mr. Abrams. Although a court might decide that such an abrupt change in direction could justify denying the motion relatively summarily, because the issues raised in the Movants' supplemental papers are of such serious nature, the court elects to address them in detail.

According to the Movants, the record before the court evinces a scheme by Axa to "buy" the cooperation and testimony of Mr. Grao. Specifically, the Movants maintain that the evidence reveals that Axa "devised a plan to gain the full cooperation, help and sympathy" of Mr. Grao through monetary and other inducements, including making an upfront, nonrefundable payment of $20,000—unconditioned on a commensurate expenditure of time by Mr. Grao—on the eve of Mr. Grao's deposition and knowingly or recklessly paying Mr. Grao $20,000 over and above the fees recorded and invoiced by Mr. Grao.[10] The

---

**10.** The Movants also suggest that one of Axa's "inducements" to Mr. Grao was an agreement that Axa would indemnify Mr. Grao for any personal liability to which he might be subjected in the course of the litigation. The Movants, however, offer only a few passing references to this alleged inducement and fail to elaborate on the nature or extent of this indemnification agreement. In the absence of any other evidence of

indemnification, the court assumes that the Movants are referring to Axa's agreement to extend the protections of its D & O policy to Mr. Grao for purposes of his deposition and at trial. The Movants have offered no evidence that such an agreement, in the context of this case, is improper. For all of these reasons, the court rejects the Movants' argument that Axa or its counsel in-

Movants contend that these payments and protections given to Mr. Grao violate common law and public policy against paying fact witnesses for testimony; violate the federal anti-gratuity statute, *see* 18 U.S.C. § 201(c)(2); and violate Model Rule of Professional Conduct 3.4(b). For the reasons set forth more fully below, the court rejects these arguments.

### A. Public Policy

As their first basis for sanctions against Axa and Axa's counsel, the Movants highlight the public policy against paying a fact witness for his or her testimony. *See, e.g., United States v. Singleton,* 144 F.3d 1343, 1347 (10th Cir.1998) (contracts to pay fact witnesses are void as violative of public policy), *vacated on other grounds,* 165 F.3d 1297 (10th Cir.), *cert. denied,* 527 U.S. 1024, 119 S.Ct. 2371, 144 L.Ed.2d 775 (1999). The court, of course, does not disagree with the statement of this policy. Having carefully considered the evidence in the record, however, the court concludes that neither Axa nor its counsel paid Mr. Grao for the substance or strength of his testimony. In that regard, the court turns first to the $20,000 nonrefundable lump-sum payment made to Mr. Grao on the eve of his deposition. The Movants claim that the nature and timing of this payment is "proof" that the payment was made to "buy" Mr. Grao's testimony. If the record revealed only the facts that the Movants have asserted, the court agrees that such a payment would be, at the very least, suspicious. But the record here reveals much more. First, Axa and its counsel agreed to the payment—intended to be an advance that would be credited against services provided by Mr. Grao in the future— only after it realized that, assuming they projected accurately the amount of time they would need from Mr. Grao, they would eventually be obligated to pay Mr. Grao a sum well in excess of $20,000. Second, the payment was supposed to be made at the time Mr. Grao executed the Agreement. It was made on the eve of his deposition only because of delays that Cozen & O'Connor experienced with regard to the transfer of funds

from Axa. Finally, at the time Mr. Kende delivered the check to Mr. Grao, Mr. Grao had already earned $17,906 under the terms of the Agreement. In light of these circumstances, and in the absence of evidence suggesting otherwise, the court is unwilling to conclude that the lump-sum payment was made to buy Mr. Grao's testimony.

Similarly, the court finds no basis for sanctions with respect to the $20,000 overpayment made to Mr. Grao. The Movants suggest that this overpayment was not a clerical error but that Axa or its counsel knowingly "overpaid" Mr. Grao in order to induce his cooperation. In light of all of the circumstances surrounding the overpayment, the court disagrees. Mr. Kende averred that the overpayment was the result of a clerical error as he had delegated the task of processing Mr. Grao's invoice to his staff and the firm's accounting department. The court has been shown no reason to doubt Mr. Kende's explanation. Significantly, the invoice that Mr. Grao faxed to Mr. Kende showed the "total" amount due as $43,593.50. Although Mr. Grao noted on a separate line of the invoice that the "outstanding balance due to date is $23,593.50," the invoice does not otherwise reflect that Mr. Grao had already received $20,000. In these circumstances, it is reasonable to believe that someone unfamiliar with the facts surrounding Mr. Grao's compensation could mistakenly conclude that Mr. Grao was owed $43,593.50. In sum, the court concludes that the payments made to Mr. Grao were made solely for the purpose of compensating Mr. Grao for the time he lost in order to give testimony in the litigation, review documents produced in the litigation, and otherwise consult with Axa and its counsel on matters related to the litigation.

 That is not the end of the inquiry, of course. Even though the court concludes that Axa and its counsel paid Mr. Grao only for time spent in connection with the litigation process, the court must still determine whether the amount of Mr. Grao's compensation was reasonable. For if Mr. Grao's compensation seems unreasonably high or disproportionate to the time actually spent

duced Mr. Grao's cooperation by offering to indemnify him.

on litigation matters, then an inference could be drawn that the payments, in reality, were made for the substance or efficacy of Mr. Grao's testimony. *See* ABA Comm. on Ethics and Professional Responsibility, Formal Op. 96–402 (1996) (The amount of compensation paid to a fact witness "must be reasonable, so as to avoid affecting, even unintentionally, the content of a witness's testimony.").

The American Bar Association's Committee on Ethics and Professional Responsibility has set forth some guidance in ascertaining whether the amounts paid to a fact witness are reasonable:

> What is a reasonable amount is relatively easy to determine in situations where the witness can demonstrate to the lawyer that he has sustained a direct loss of income because of his time away from work—as, for example, loss of hourly wages or professional fees. In situations, however, where the witness has not sustained any direct loss of income in connection with giving, or preparing to give, testimony—as, for example, where the witness is retired or unemployed—the lawyer must determine the reasonable value of the witness's time based on all relevant circumstances.

*Id.* The court, then, looks to the relevant circumstances surrounding the value of Mr. Grao's time, both in terms of the hourly rates received and the number of hours spent in connection with this litigation.

Under his Consulting Agreement with Cozen & O'Connor, Mr. Grao was paid $125 per hour for the review and study of documents and deposition transcripts; $150 per hour for the attendance at meetings and in preparation for testimony; and $200 per hour for testifying at his deposition or at trial. Considering Mr. Grao's years of experience in the insurance industry, his firsthand experience with the reinsurance agreements that are the subject of this lawsuit, and the complex nature of this litigation (involving numerous transactions spanning a number of years), these rates are justified. Moreover, the Movants have offered no evidence suggesting that Mr. Grao's rates are unreasonable. In fact, Mr. Grao disclosed these rates in his deposition to the Movants' counsel. Counsel expressed no concern or surprise. In short, the court concludes that the hourly rates charged by Mr. Grao are reasonable given the nature of both Mr. Grao's experience and this litigation.

The court also concludes that the amount of time Mr. Grao spent in connection with this litigation is reasonable. Several factors support this conclusion. First, prior to making any payments to Mr. Grao, Axa's counsel carefully considered the amount of time that they believed Mr. Grao would reasonably spend in connection with the litigation. In that regard, Axa's counsel anticipated that they would need approximately 300 hours of Mr. Grao's time during the litigation process. This projection was based on the length of Mr. Grao's deposition testimony; the need for Mr. Grao's assistance in preparing for the depositions of approximately 20 witnesses; the need for Mr. Grao's assistance in analyzing many of the 100,000 documents that had been produced in the litigation; and Mr. Grao's possible trial testimony. Again, considering the complex nature of this case and the thousands of documents that have been produced, this projection seems reasonable to the court.

Significantly, counsel for the Movants have offered no evidence to the contrary. They do, however, argue that the payments made to Mr. Grao are "unquestionably" unreasonable based on the fact that the number of hours Mr. Grao spent in connection with the litigation (approximately 380 hours) exceeded the number of hours that Axa's counsel had projected. This argument lacks merit. The amount of time that Mr. Grao actually expended is reasonably close to the time that Axa's counsel projected. A rule that required counsel in a complex case to project with precision the number of hours a consultant (or a fact witness akin to Mr. Grao in terms of knowledge of and involvement in the subject matter of the litigation) might spend on litigation matters is simply unworkable. The Movants also contend that the amount paid to Mr. Grao is unreasonable because it far exceeds the amount paid to Andre Duval, another critical fact witness in the case. The record, however, reflects that Mr. Duval

spent far less time on litigation matters than Mr. Grao and that Axa never engaged Mr. Duval as a consultant or considered Mr. Duval as a potential expert. In sum, in the absence of any evidence that Mr. Grao did not actually spend 380 hours on work related to this case, the court finds that the amount is reasonable.[11]

For all of reasons set forth above, the court concludes that neither Axa nor its counsel paid Mr. Grao for his testimony. The Movants' request for sanctions on this basis is denied.[12]

### B. The Federal Anti–Gratuity Statute

The language of the federal anti-gratuity statute "could not be more clear." *United States v. Singleton*, 144 F.3d 1343, 1345 (10th Cir.1998), *vacated on other grounds*, 165 F.3d 1297 (10th Cir.), *cert. denied*, 527 U.S. 1024, 119 S.Ct. 2371, 144 L.Ed.2d 775 (1999). It says:

> Whoever ... directly or indirectly, gives, offers or promises anything of value to any person, for or because of the testimony under oath or affirmation given or to be given by such person as a witness upon a trial, hearing, or other proceeding, before any court ... authorized by the laws of the United States to hear evidence or take testimony ... shall be fined under this title or imprisoned for not more than two years, or both.

18 U.S.C. § 201(c)(2). As the Movants highlight, the anti-gratuity provision of section 201(c)(2) "indicates Congress's belief that justice is undermined by giving, offering, or promising anything of value for testimony." *See Singleton*, 144 F.3d at 1346. Section 201(d) provides a specific exception to the anti-gratuity provision of section 201(c)(2). This subsection provides that section 201(c)(2)

shall not be construed to prohibit the payment or receipt of witness fees provided by law, or the payment, by the party upon whose behalf a witness is called and receipt by a witness, of the reasonable cost of travel and subsistence incurred and the reasonable value of time lost in attendance at any such trial, hearing, or proceeding or in the case of expert witnesses, a reasonable fee for time spent in the preparation of such opinion, and in appearing and testifying.

18 U.S.C. § 201(d).

As an initial matter, the Movants simply assume, without argument, that the payments made to Mr. Grao were made "for" or "because of" Mr. Grao's testimony. According to the Movants, "the fact that Mr. Kende was forced to hand-deliver the up-front payment of $20,000 to Mr. Grao the day before his deposition is proof enough that the money paid [to Mr.] Grao was 'for' or 'because of' his testimony. There is no other plausible explanation or interpretation." As set forth above in connection with the Movants' public policy argument, the court concludes that Axa has provided a reasonable and credible explanation for the $20,000 payment to Mr. Grao. Stated another way, the court has concluded, based on the evidence before it, that neither Axa nor its counsel paid money to Mr. Grao "for" or "because of" his testimony. Accordingly, the court must conclude that no violation of section 201(c)(2) occurred. *See Singleton*, 144 F.3d at 1345 (essential element of section 201(c)(2) violation is that payment must be made "for" or "because of" the person's testimony).

Despite this fatal flaw, the court nonetheless addresses the Movants' remaining arguments. Because the Movants view Mr. Grao as a fact witness (such that the expert witness exception found in section 201(d) would

**11.** The Movants also suggest that this amount is unreasonable because Axa "questioned the validity and amount of billings submitted by Mr. Grao." As set forth above, however, the court rejects this interpretation of the record. *See supra* note 7.

**12.** In support of their public policy argument, the Movants rely primarily on *Hamilton v. General Motors Corp.*, 490 F.2d 223 (7th Cir.1973) and

*State of New York v. Solvent Chemical Co.*, 166 F.R.D. 284 (W.D.N.Y.1996). These cases are not inconsistent with the court's conclusion here today. *See, e.g., Solvent Chemical*, 166 F.R.D. at 289 (While the payment of money to a witness to make him "sympathetic" with party expecting to call him is "indefensible," there is nothing improper in the payment of a "reasonable hourly fee" for the witness's time.).

not apply), they frame the issue before the court as "whether the value given to Mr. Grao by Axa exceeds the reasonable value of time lost in attendance 'at any such trial, hearing, or proceeding.'" According to the Movants, most of the $70,000 paid to Mr. Grao was for time spent preparing for his deposition, reviewing the deposition transcripts of other witnesses, and reviewing documents produced in the litigation. Payment for these activities, following the Movants' argument, falls outside the limited exceptions in section 201(d). Thus, the Movants contend that the statute has been violated because Mr. Grao, a fact witness, was paid for these "non-testifying" activities.

The court rejects this argument. Curiously, counsel learned during Mr. Grao's deposition that he was being compensated for non-testifying activities such as reviewing documents and preparing for his deposition. At that time, too, counsel for the Movants considered Mr. Grao a fact witness. Counsel expressed no concern about Mr. Grao's compensation arrangement at any time during or after Mr. Grao's deposition (until, of course, Mr. Grao disclosed in August 1999 that he allegedly had been paid money to "keep quiet" and that he had been paid a lump-sum payment). In fact, in response to Axa's request for sanctions, the Movants vigorously contend throughout their papers that they believed that Mr. Grao was simply a fact witness who was being compensated for time spent in connection with his deposition, including reviewing materials in preparation for the deposition. In light of these facts, the court questions the sincerity of the Movants' argument here.

■ Moreover, the Movants have directed the court to no authority supporting their argument that a person violates the anti-gratuity statute by paying a fact witness reasonable compensation for time spent in connection with legitimate, non-testifying activities such as reviewing documents in preparation for the deposition and meeting with

lawyers in preparation for the deposition. In fact, the only authority the court has uncovered on this issue suggests that such compensation is lawful. *See, e.g.,* ABA Comm. on Ethics and Professional Responsibility, Formal Op. 96–402 (1996) (Under Rule 3.4(b), occurrence witnesses may be reasonably compensated for time spent in attending a deposition or trial; for time spent in pretrial interviews with the lawyer in preparation for testifying; and for time spent in reviewing and researching records that are germane to his or her testimony).[13]

For all of the foregoing reasons, the court concludes that no violation of the federal anti-gratuity statute has occurred here. The Movants' request for sanctions on this basis is denied.

### C. Model Rule of Professional Conduct 3.4(b)

Finally, the Movants argue that Axa's counsel violated Model Rule of Professional Conduct 3.4(b). Rule 3.4(b), as adopted by the Kansas Supreme Court,[14] prohibits a lawyer from offering "an inducement to a witness that is prohibited by law." Kan.S.Ct. Rule 226 at Rule 3.4(b). The court, however, has held that the conduct of Axa and its counsel did not run afoul of the common law or public policy against paying witnesses for testimony and that the conduct of Axa and its counsel did not violate 18 U.S.C. § 201(c)(2). Accordingly, the court must conclude that no violation of Rule 3.4(b) occurred. *See also* ABA Comm. on Ethics and Professional Responsibility, Formal Op. 96–402 (1996) (Under Rule 3.4(b), occurrence witnesses may be reasonably compensated for time spent in attending a deposition or trial; for time spent in pretrial interviews with the lawyer in preparation for testifying; and for time spent in reviewing and researching records that are germane to his or her testimony).

### IV. Axa's Request for Sanctions Against the Movants

In response to the Movants' motion for sanctions, Axa and its counsel not only deny

---

13. The Movants' final argument is simply that the payments made to Mr. Grao were unreasonable. The court has considered and rejected this argument above in connection with the Movants' public policy argument.

14. The District of Kansas, in turn, has adopted the Model Rules of Professional Conduct as adopted by the Kansas Supreme Court. *See* D.Kan.Rule 83.6.1(a).

any wrongdoing but also affirmatively seek sanctions against the Movants and their counsel. Specifically, Axa asserts that the Movants and their counsel violated Model Rule of Professional Conduct 4.2 by communicating with Mr. Grao who, according to Axa, was represented by Axa's counsel. Axa further claims that these communications with Mr. Grao violated the spirit of Federal Rule of Civil Procedure 26(b)(4)(B) because of Mr. Grao's alleged status as a non-testifying expert. Finally, Axa requests the court impose sanctions against the Movants' counsel pursuant to 28 U.S.C. § 1927 for counsel's allegedly unreasonable and vexatious conduct in connection with the filing and pursuit of their sanctions motion. As set forth in more detail below, the court rejects all of Axa's arguments.

### A. Model Rule of Professional Conduct 4.2

Rule 4.2 of the Model Rules of Professional Conduct, as adopted by the Kansas Supreme Court,[15] prohibits a lawyer from communicating "about the subject of the representation with a *party* the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so." Kan.S.Ct.Rule 226 at Rule 4.2 (emphasis added). Axa concedes that Mr. Grao is not a party to this litigation (*i.e.*, that Mr. Grao is not an individual plaintiff or defendant). Moreover, although Axa is an organizational party in this litigation and Mr. Grao at one time was a managerial employee of Axa, Axa further concedes that Mr. Grao no longer has an employment relationship with Axa.

■ Faced with these precise circumstances, this court has previously held that Rule 4.2 is inapplicable. *See Aiken v. Business & Industry Health Group, Inc.*, 885 F.Supp. 1474 (D.Kan.1995). Specifically, this court concluded, as had the American Bar Association and virtually every court which had looked at the issue since the ABA issued its formal opinion, *see id.* at 1477–78, that *former* employees who no longer have an employment relationship with the organizational party are not included within the meaning of the term "party" for purposes of Rule 4.2. *See id.* at 1478. The court reiterates that ruling today and concludes that Rule 4.2 is simply inapplicable to the Movants' communications with Mr. Grao.

Mindful of this court's conclusion in *Aiken*, Axa attempts to distinguish the facts presented to the court in *Aiken* from those presented here. Specifically, Axa contends that *Aiken* does not apply here because, according to Axa, the Movants' contacts with Mr. Grao infringed upon a direct lawyer-client relationship between Mr. Kende and Mr. Grao. By contrast, *Aiken* involved a claim of implied legal representation of a corporation's former employees. This argument is without merit. The distinction that Axa draws is one without a difference—the particular facts concerning the alleged representation in *Aiken* had no bearing on the court's ultimate conclusion in that case concerning the contours of Rule 4.2. In other words, regardless of whether Mr. Grao was actually represented by counsel in connection with this litigation,[16] he is still not a "party" to the lawsuit for purposes of Rule 4.2.

15. *See supra* note 14.

16. The court questions Axa's argument that Mr. Grao was represented by Mr. Kende or the Cozen & O'Connor firm. The record before the court demonstrates that the Cozen & O'Connor firm represented Mr. Grao only "at his deposition and at trial." *See* Kende Aff. ¶ 12; Consulting Agreement ¶ 10. In fact, Axa concedes as much in its papers. *See* Axa's Br. in Opp. at 14 ("Mr. Kende represented Mr. Grao in connection with his deposition and was to represent him in connection with his trial testimony."); *id.* at 18 ("Mr. Kende was ... engaged by Mr. Grao to represent him both in connection with preparation for his deposition and at the deposition itself."). There is no evidence in the record that Mr. Kende or the Cozen & O'Connor firm represented Mr. Grao at the time the Movants communicated with Mr. Grao. Moreover, Mr. Abrams, counsel for CMS, testified in an affidavit that he specifically asked Mr. Grao about the status of his legal counsel prior to engaging in any substantive communications with Mr. Grao. According to Mr. Abrams, Mr. Grao advised him that he was not represented by any counsel related to Axa; that he was represented by counsel in Paris who was unrelated to any of the parties in this litigation; and that his Paris counsel was aware of Mr. Grao's meeting with Mr. Abrams.

Axa also suggests that the language of Rule 4.2 has been "clarified" since the court's *Aiken* decision. Specifically, Axa highlights that the ABA House of Delegates, in August 1995,[17] amended Rule 4.2 to prohibit communications with a "person" rather than a "party." *See ABA Compendium of Professional Responsibility Rules and Standards* 84 n. 13 (1997). The purpose of this amendment is to clarify that Rule 4.2's coverage extends to any represented person who has an interest in the matter to be discussed and who is represented with respect to that interest, regardless of whether the person is a "party" in a formal sense to the proceeding or transaction. *Id.* at 116, 463–66. According to Axa, a similar amendment is "currently pending approval" by the Kansas Supreme Court. In essence, then, Axa invites the court to read Rule 4.2 as prohibiting communications with any represented "person," which, according to Axa, would include Mr. Grao. The court declines this invitation. The Kansas Supreme Court has not adopted the proposed amendment. Thus, the text of Rule 4.2 as it exists in Kansas remains the same today as it did when the court analyzed the rule in *Aiken.* In the absence of any persuasive argument that *Aiken* should not apply, the court applies its holding with full force to the facts of this case.

For all of the foregoing reasons, the court concludes that Rule 4.2 does not prohibit the Movants' communications with Mr. Grao. Axa's request for sanctions on this basis is denied.

### B. Federal Rule of Civil Procedure 26(b)(4)(B)

■ Axa also contends that the Movants violated Federal Rule of Civil Procedure 26(b)(4)(B) by "knowingly" contacting Mr. Grao, a "non-testifying expert witness" for Axa. This rule provides, in relevant part, that:

A party may ... discover facts known or opinions held by an expert who has been retained or specially employed by another party in anticipation of litigation or preparation for trial and who is not expected to be called as a witness at trial, only ...

upon a showing of exceptional circumstances under which it is impracticable for the party seeking discovery to obtain facts or opinions on the same subject by other means.

*See* Fed.R.Civ.P. 26(b)(4)(B). The purpose of the rule is "to promote fairness by precluding unreasonable access to an opposing party's diligent trial preparation." *Durflinger v. Artiles,* 727 F.2d 888, 891 (10th Cir. 1984) (Rule 26(b)(4)(B) prohibits a party from capitalizing on his opponent's diligent discovery efforts by calling as a witness any expert retained by the opposing party in anticipation of litigation whom that opposing party has decided not to call at trial.) (citations omitted).

As an initial matter, the court questions whether Mr. Grao can be classified as a Rule 26(b)(4)(B) expert. The record before the court suggests that the primary reason Axa desired a consulting relationship with Mr. Grao is Mr. Grao's "firsthand knowledge of the significant contacts that Axa Re had with Centennial and its brokers"—contacts "which form the basis for the dispute existing between Axa Re and Centennial." *See* Kende Aff. ¶ 4. Specifically, in his capacities as a Senior Vice President of Axa Re and the President of Axa Re Vie, Mr. Grao had "direct supervision over the Centennial reinsurance program from its inception at Axa Re." *See id.* The reinsurance program is at the very heart of this litigation. In other words, it seems as if Mr. Grao's knowledge was not acquired in preparation for trial but rather because he was a participant in the transactions that are the subject matter of this suit. According to the drafters of Rule 26, "[s]uch an expert should be treated as an ordinary witness." *See* Fed.R.Civ.P. 26 advisory committee notes ("[Rule 26(b)(4)] does not address itself to the expert whose information was not acquired in preparation for trial but rather because he was an actor or viewer with respect to transactions or occurrences that are part of the subject matter of the lawsuit."; "Subdivision (b)(4)(B) ... exclud[es] an expert who is simply a general employee of the party not specially employed

17. This court's decision in *Aiken* was issued in April 1995.

on the case."). Ultimately, however, the court need not decide whether Mr. Grao was retained as an expert within the meaning of Rule 26(b)(4)(B) because, even assuming that he was, there is no evidence before the court that the Movants knew of Mr. Grao's alleged status as such an expert at the time they communicated with him in August and September 1999.

Axa's request for sanctions under Rule 26(b)(4)(B) is premised on its assertion that counsel for the Movants were "well aware" that Axa (or, more specifically, Axa's counsel) had retained and identified Mr. Grao as an expert witness (or a "non-testifying consultant") for Axa at the time counsel for the Movants communicated with Mr. Grao in Fall of 1999. In support of its assertion that counsel for the Movants knew about Mr. Grao's role in this litigation, Axa directs the court to the January 1999 deposition testimony of Mr. Grao and Axa's February 1999 expert witness designations.

The court looks first to Mr. Grao's deposition testimony for evidence that the Movants knew about Mr. Grao's alleged status as a Rule 26(b)(4)(B) expert. According to Axa, the Movants should have known that Axa had retained Mr. Grao as an expert because Mr. Kende, Axa's counsel, asked Mr. Grao during his deposition for his expert opinion on several matters and Mr. Grao answered accordingly. While Mr. Grao's deposition does contain these types of exchanges, a complete review of those excerpts reveals that counsel for the Movants objected several times during Mr. Kende's examination of Mr. Grao on the grounds that Mr. Kende was asking Mr. Grao for an expert opinion when, in fact, Mr. Grao had "only been designated as a fact witness." Mr. Kende's only reply to these objections was an instruction to Mr. Grao to "go ahead." There was no basis for the Movants to conclude that Mr. Grao had been retained as an expert of any sort from Axa's dubious litigation tactic of not disclosing Mr. Grao's actual role until after the deposition but putting to him questions which would be objectionable if put to a non-expert.

In any event, Axa's argument here misses the mark. Even assuming the Movants knew that Axa had retained Mr. Grao as an

expert who AXA contemplated would provide testimony such as the expert opinions Mr. Grao offered during his deposition, this assumption goes only to whether the Movants knew of Mr. Grao's status as an expert within the meaning of Rule 26(b)(4)(A). It has no bearing on whether the Movants knew that Axa had retained Mr. Grao as a non-testifying consultant within the meaning of Rule 26(b)(4)(B). In fact, it would be strange, indeed, for a lawyer to ask questions of a non-testifying consultant at a deposition about the very subject on which the expert was supposed to consult but not testify.

Axa also urges that the Movants knew about the consulting agreement between Axa's counsel and Mr. Grao because Mr. Grao disclosed as much during his deposition. In response, the Movants concede that Mr. Grao testified about an "agreement" with Axa's counsel, but that his testimony revealed only that Cozen & O'Connor was reimbursing Mr. Grao for his time spent in connection with his deposition, including reviewing materials in preparation for the deposition. The relevant examination, conducted by Mr. Cotter, counsel for Jardine, is as follows:

Q: How are you being compensated, if you are, for the time that you're spending in this deposition today?

A: I am compensated, yes.

Q: Who is compensating you?

A: The lawyer [sic], Cozen and O'Connor.

****

Q: Cozen and O'Connor are compensating you for your time in being here?

A: Yes.

Q: What are the arrangements as to the compensation?

A: Not enough.

Q: Are you paid by the hour?

A: Yes.

Q: What is your charge by the hour?

A: It depends. During a deposition it's something, but I don't remember really what is it [sic]. I don't—I think it's—there are three rates. One of 125, one 150, and $200 per hour.

Q: Is the 125 for any preparation for testimony and meetings?

A: No, it's to look at some documents.

Q: What's the 150 for?

A: I don't know. I supposed it's preparation to [sic] meetings.

Q: And the 200 is—

A: Deposition.

Q:—for giving a deposition?

A: Yes.

Q: And then are your expenses also paid?

A: Yes.

Q: How much time have you spent in preparing for this deposition?

A: I don't send to Cozen and O'Connor time I spent on this case so I can't answer you.

Q: Do you have any idea how much time you've spent in preparing?

A: A lot.

Q: A lot?

A: It will be very expensive. I don't know. We have a signed—this agreement in November—in December. December, so it's not known.[18]

Q: Have you spent time in actually reviewing documents?

A: Yes.

Q: Have those documents been provided to you for your review or have you taken certain documents when you were—

A: No. No. I received some documents.

At some point later in Mr. Grao's deposition, Mr. Cotter revisited the issue of Mr. Grao's compensation. Specifically, the following exchange occurred:

Q: Now, Mr. Grao, with regard to your deposition here the last few days, you said you're being compensated by AXA for your time; correct?

A: By AXA? During my deposition?

Q: Yes, sir.

A: Not by AXA.

Q: By their attorneys?

A: I have a contract with Cozen and O'Connor, yes.

Q: Your contract is with the law firm for AXA. And you've already described to us what they're paying. Have you sent out any invoice at all yet?

A: Yes.

Q: And when did you send an invoice?

****

A: It was in January this year.

Q: Do you have an approximation of how much time was on that letter you submitted?

A: Around 140 hours.

Q: And you're being compensated for reviewing things at a rate of, did you say a hundred dollars an hour, to review documents?

A: One hundred and twenty-five.

Q: A hundred and twenty-five. And then in addition to the time in reviewing things, you're also being compensated for your time here this week?

A: Yes, sir.

Axa has not directed the court to any additional deposition excerpts that might reflect on the Movants' knowledge of Mr. Grao's status as an expert or a consultant. Having reviewed these deposition excerpts, the court concludes that the Movants could not have known, based solely on Mr. Grao's deposition testimony, that Mr. Grao had been retained as an expert within the meaning of Rule 26(b)(4)(B). Rather, Mr. Grao's testimony supports the Movants' assertion that, at the time they communicated with Mr. Grao in August and September 1999, they considered Mr. Grao as a fact witness who had been reimbursed for time spent in connection with his deposition. It would have been a simple matter for Axa to have disclosed Mr. Grao's true status at the time of the deposition and not left it to ex post facto guesswork; Axa chose not to do so at its peril.

---

18. According to the Movants, they requested a copy of the compensation agreement shortly after Mr. Grao's deposition, but Axa's counsel refused to produce the agreement on the grounds the agreement was protected from disclosure by the attorney work-product privilege.

The court turns, then, to Axa's expert witness designations for evidence that the Movants knew of Mr. Grao's status as a Rule 26(b)(4)(B) expert. On February 16, 1999, pursuant to Federal Rule of Civil Procedure 26(a)(2), Axa designated Mr. Grao as an expert witness who, according to Axa, would "discuss his opinions regarding the duties of utmost good faith running between a reinsurer and its reinsured, the role and standard of care and duty of good faith owed by reinsurance intermediaries to reinsurers, the standard of care generally owed by brokers to reinsurers, as well as the standard of care owed by a ceding company to its reinsurer." *See* Defendants' Designation of Expert Witness (doc. # 158). The Movants promptly objected to this designation on the grounds that Mr. Grao had not been identified as an expert during his 4–day deposition in January 1999. Specifically, the Movants demanded that Axa either produce Mr. Grao for another deposition so that the Movants could inquire about the issues identified in Axa's designation or remove Mr. Grao from its expert designations. On or before April 1, 1999, Axa advised the Movants that Mr. Grao would not be designated as an expert in the case.[19]

Although Axa concedes it withdrew the designation, it contends that it "never advised [the Movants] that Mr. Grao was not going to be used as a Rule 26(b)(4)(B) non-testifying, consulting expert." While this is certainly true, the mere fact that Axa never advised the Movants that they would *not* use Mr. Grao as non-testifying consultant does not require the inference that the Movants somehow knew that Axa would use Mr. Grao as such an expert. This is particularly true here in light of the absence of any other evidence suggesting that the Movants had any knowledge that Axa ever intended to retain or did in fact retain Mr. Grao as a non-testifying consultant within the meaning of Rule 26(b)(4)(B).

In short, the record supports the Movants' assertion that, at the time they communicated with Mr. Grao in August and September 1999, they considered that Mr. Grao was simply a fact witness compensated for his time. Axa's request for sanctions based on the Movants' alleged violation of Rule 26(b)(4)(B) is denied.

### C. Axa's Request for Attorneys' Fees and Costs

Finally, Axa seeks to recover from the Movants' counsel its attorneys' fees and costs incurred in responding to the Movants' motion because, according to Axa, the Movants' counsel "have demonstrably acted in an unreasonable and vexatious manner with their Motion for Sanctions." In support of its request, Axa essentially maintains that the Movants' counsel failed to make reasonable inquiry of opposing counsel prior to filing their motion for sanctions and that counsel have multiplied the proceedings by continuing to file supplements to their motion without any reliable evidence of wrongdoing.

■ Axa's request is made pursuant to 28 U.S.C. § 1927. That section provides as follows:

Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

28 U.S.C. § 1927. In *Braley v. Campbell*, 832 F.2d 1504 (10th Cir.1987), the Tenth Circuit articulated the proper standard for imposing attorney's fees and costs personally against an attorney under section 1927. *See Miera v. Dairyland Ins. Co.*, 143 F.3d 1337, 1342 (10th Cir.1998). That standard rejected a subjective good faith inquiry and concluded, instead, that sanctions under section 1927 are warranted only when the conduct "viewed objectively, manifests either intentional or reckless disregard of the attorney's duties to the court." *See id.* (quoting *Braley*, 832 F.2d at 1512). This standard is then used to decide whether "by acting recklessly or with indifference to the law, as well as by acting in the teeth of what he knows to be the law," an attorney subjects himself to

---

**19.** Axa never submitted an expert report on behalf of Mr. Grao.

sanctions under section 1927. *Id.* (quoting *In re TCI Ltd.,* 769 F.2d 441, 445 (7th Cir. 1985)). As the Tenth Circuit summarized in *Miera,* sanctions are appropriate under section 1927 when an attorney is "cavalier or 'bent on misleading the court;'" when an attorney "intentionally acts without a plausible basis;" "when the entire course of the proceedings was unwarranted;" or when "certain discovery is substantially unjustified and interposed for the improper purposes of harassment, unnecessary delay and to increase the costs of the litigation." *See id.* (citations omitted). Finally, because section 1927 "is penal in nature, 'the award should be made "only in instances evidencing serious and standard disregard for the orderly process of justice."'" *Id.* (citations omitted).

█ The court does not believe that the conduct of the Movants' counsel evidences a serious disregard for the orderly process of justice. While the Movants' motion for sanctions was unsuccessful, there is no evidence that counsel for the Movants "intentionally acted without a plausible basis" in pursuing their motion or that the issues underlying the motion for sanctions would have been rendered moot if counsel for the Movants had contacted Axa's counsel prior to filing the motion. Significantly, Mr. Grao affirmatively sought out the Movants in an effort to "sell" information to them about Axa's case. He further advised the Movants, without any prompting from the Movants, that Axa and/or Axa's counsel had paid him significant amounts of money to "keep quiet." Faced with these statements, the Movants acted reasonably when they sought leave to discover additional information about the nature of Axa's relationship with Mr. Grao. Moreover, although further discovery revealed that Mr. Grao had not been paid "hush money" by Axa, it also revealed that Axa had, in fact, paid Mr. Grao a lump-sum payment of $20,000 on the eve of his deposition and that Mr. Grao had been paid an additional $20,000 over and above his actual earnings. Although Axa has since explained these payments, the court cannot criticize the Movants for pressing their Motion in light of these facts. In sum, the conduct of the Movants' counsel does not warrant section 1927 sanc-

tions under *Braley.* Axa's request for sanctions is denied.

## V. Evidentiary Issues

Although the court denies the parties' requests for sanctions, one issue remains in dispute—whether the affidavits or documentary evidence produced in connection with the motion for sanctions will be admitted at trial. The Movants suggest that, at a minimum, the documents produced by Axa should be admitted so that the jury may assess Mr. Grao's credibility. Axa objects to this suggestion, pointing out that the Movants have failed to offer any authority under the Federal Rules of Evidence for the admission of the documents. In any event, the court need not decide this issue today. The Movants, however, will not be permitted to introduce any of their affidavits or documentary evidence for the purpose of trying to show that Axa or its counsel "bought" the testimony of Mr. Grao or otherwise engaged in any unlawful or unethical conduct. The court has decided that issue today in Axa's favor. The court makes no ruling, however, with respect to whether any of the evidence set forth in connection with the sanctions motion bears on Mr. Grao's credibility and, to the extent it does, whether that evidence might be admissible for the limited purpose of attacking (or bolstering) Mr. Grao's credibility. These issues will be resolved in connection with any motions in limine that the parties may choose to file.

## VI. Scheduling Issues

The court has previously notified counsel for all parties that a trial of this action will commence on **May 2, 2000.** In keeping with that trial date, the court hereby sets the following deadlines for certain pre-trial filings.

Any motions concerning the principles set forth by the Supreme Court in *Kumho Tire* shall be filed on or before March 20, 2000. Responses to such motions shall be filed on or before April 3, 2000 and any replies to those responses shall be filed on or before April 14, 2000.

Any other motions in limine shall be filed on or before April 10, 2000. Responses to

such motions shall be filed on or before April 17, 2000 and any replies to those responses shall be filed on or before April 21, 2000 by 5:00 pm.

The parties' disclosures under Federal Rule of Civil Procedure 26(a)(3) shall be made on or before April 3, 2000. Any objections to those disclosures must be filed on or before April 17, 2000.

Any deposition testimony sought to be offered by a party other than to impeach a testifying witness shall be designated by page and line by April 3, 2000. Any objections and/or counter-designations shall be made by April 10, 2000. Any objections to any counter-designations shall be made by April 17, 2000.

The court will conduct a hearing on any *Kumho Tire* motions on April 19, 2000 at 9:30 am. On April 26, 2000 at 9:30 am, the court will conduct a hearing on any other motions in limine and to address any issues related to deposition testimony. With respect to the latter, the parties are to present the court no later than April 21, 2000 at 5:00 pm with transcripts of depositions. These transcripts shall have the disputed testimony highlighted or otherwise marked. Objections to the disputed testimony and responses shall be written in the margin of the transcript. CMS shall use black ink; Axa shall use blue ink; and the third-party defendants shall use green ink. **The court will not entertain any objections to deposition testimony unless and until the parties have attempted in good faith to resolve the dispute amongst themselves either in person or via telephone conference.**

Any trial briefs shall be filed no later than April 21, 2000 at 5:00 pm.

Proposed jury instructions shall be filed no later than April 25, 2000.

**All service on opposing counsel shall be by via facsimile or hand-delivery. A courtesy copy of all papers addressed in this order shall be delivered directly to chambers at the time of filing.**

**IT IS THEREFORE ORDERED BY THE COURT THAT** plaintiff's and third-party defendants' joint motion for sanctions against Axa and Axa's counsel (doc. # 298) is

denied. It is further ordered that Axa's request for sanctions against plaintiff and third-party defendants is **denied.** With respect to the further processing of this case in preparation for the **May 2, 2000 trial date,** counsel for all parties should refer to the deadlines set forth in section VI of this order.

**IT IS SO ORDERED.**